**No. 26-1746**
**(consolidated with 26-5060)**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

SHAWN JENSEN, ET AL.

*Plaintiffs-Appellees*,

v.

RYAN THORNELL, ET AL.

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Arizona
No. CV-12-00601-PHX-ROS
Hon. Roslyn O. Silver

---

# BRIEF OF *AMICI CURIAE* ARIZONA HOUSE OF REPRESENTATIVES SPEAKER STEVE MONTENEGRO AND ARIZONA STATE SENATE PRESIDENT WARREN PETERSEN IN SUPPORT OF DEFENDANTS/APPELLANTS' OPENING BRIEF

---

Joseph Kanefield (Bar No. 015838)
Brett W. Johnson (Bar No. 021527)
Cole Craghan (Bar No. 038614)
Snell & Wilmer LLP
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: (602) 382-6000
jkanefield@swlaw.com
bwjohnson@swlaw.com

ccraghan@swlaw.com
*Attorneys for Amici Curiae House Speaker Steve Montenegro and Senate President Warren Petersen*

# TABLE OF CONTENTS


**Page**

I. Interests of the Amicus Curiae ....................2

II. The Receivership Standard is Not Met ....................4

a. A Receivership is Highly Intrusive and Only Available as the Last Remaining Remedy ....................5

b. The Record Does Not Satisfy the Demanding Receivership Standard ....................6

1. ADCRR Has Demonstrated Measurable, Recent Progress ....................8

2. Disagreement with Monitors Does Not Establish Bad Faith ....................9

3. ADCRR's Improvements Do Not Reflect Truly Entrenched Noncompliance ....................10

4. Courts Should Not Displace State Officials Based on Past Shortcomings Rather Than Present Capacity ....................11

III. Federalism Principles Warrant Overturning the Receivership ....................12

a. Prison Administration Stands at the Apex of Sovereign State Authority ....................13

b. Heightened Deference to Prison Administration Is Firmly Established ....................14

c. The Order's Control Over Budgetary Authority Further Infringes on the State's Authority ....................15

d. These Federalism Concerns Are Reinforced by Considerations of Democratic Accountability ....................17

IV. The Scope of the Receivership Violates Autonomy Over the State's Budget ....................19

a. A Receiver Cannot Be Given Unreviewable Budget Authority ....................19

b. The Order Disregards the Legislature's Competing Statewide Obligations ....................21

c. The Receiver Should Not Be Empowered to Spend Without Legislative Authorization or Oversight ....................23

d. The Order Will Increase Costs Without Reaching the Injunction's Goals ....................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................9, 10

*Brown v. Plata*,
563 U.S. 493 (2011) (Scalia, J., dissenting) ....................15

*District of Columbia v. Jerry M.*,
738 A.2d 1206 (D.C. App. 1999) ....................5

*Frew v. Hawkins*,
540 U.S. 431 (2003)....................16

*Guajardo v. Fed. Bureau of Prisons*,
363 F.3d 392 (5th Cir. 2004) ....................20

*Horne v. Flores*,
557 U.S. 433 (2009)....................*passim*

*Hutto v. Finney*,
437 U.S. 678 (1978)....................10

*L.A. All. for Human Rights v. City of Los Angeles*,
792 F. Supp. 3d 1049 (C.D. Cal. 2025)....................5

*Lewis v. Casey*,
518 U.S. 343 (1996) (Thomas, J., concurring) ....................13

*M.D. by Stukenberg v. Abbott*,
119 F.4th 373 (5th Cir. 2024) ....................15

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers)....................13, 17

*Melendres v. Sheridan*,
No. CV-07-2513-PHX-GMS, Doc. 3263 (D. Ariz. Oct. 8, 2025)....................24

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) ....................5

*Missouri v. Jenkins*,
515 U.S. 70 (1995) (Thomas, J., concurring) ....................................4, 15, 21, 23

*Newman v. Alabama*,
466 F. Supp. 628 (M.D. Ala. 1979) ..................................................................24

*Nunez v. N.Y.C. Dep't of Corr.*,
782 F. Supp. 3d 146 (S.D.N.Y. 2025) ...........................................................9, 12

*Parker v. Hooper*,
171 F.4th 736 (5th Cir. 2026) .........................................................................5, 9

*Plata v. Brown*,
603 F.3d 1088 (9th Cir. 2010) .........................................................................6, 7

*Plata v. Schwarzenegger*,
No. C01–1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005)...........*passim*

*Preiser v. Rodriguez*,
411 U.S. 475 (1973).........................................................................................13

*Procunier v. Martinez*,
416 U.S. 396 (1974).........................................................................................14

*Pugh v. Locke*,
406 F. Supp. 318 (M.D. Ala. 1976) ..................................................................24

*Rufo v. Inmates of Suffolk Cty. Jail*,
502 U.S. 367 (1992).........................................................................................16

*Trump v. Casa*,
606 U.S. 831 (2025).........................................................................................13

*Turner v. Safley*,
482 U.S. 78 (1987)...........................................................................................14

*United States v. Hinds Cty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) .........................................................10, 12, 20, 26

*United States v. Hinds Cty.*,
No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 (S.D. Miss. Jan. 30, 2023) ..............................................................................................9, 20, 26

*Valentine v. Collier*,
993 F.3d 270 (5th Cir. 2021) (Oldham, J., concurring)....................................20

**Statutes**

A.R.S. § 41-1608..............................................................................3, 18

18 U.S.C. § 3626(a)(1)(A) ...................................................................5, 26

**Other Authorities**

Ariz. Const. art. III ............................................................................16

Ariz. Const. art. IX, § 5 ...............................................................3, 16, 19

Fed. R. App. P. 29(a)(4)(E)....................................................................2

H.B. 2010, 49th Leg., 3d Spec. Sess. (Ariz. 2009)..............................3, 18

Laura Weingart, *Judicial Remedies of Last Resort: Receiverships in the Prison Litigation Context*, 9 Cardozo Pub. L. Pol'y & Ethics J. 193, 211 (2010).....................................................................................24

Parker Jackson, *Court-Appointed Monitor Spends Tens of Millions While Leaving Taxpayers in the Dark*, GOLDWATER INSTITUTE (Feb. 12, 2026), *https://www.goldwaterinstitute.org/court-monitor.* ................24

# INTRODUCTION

The District Court's appointment of a receiver over the Arizona Department of Corrections, Rehabilitation, and Reentry's ("ADCRR") health care operations implicates more than a multi-factored test. The receivership conflicts with principles of federalism, both in regard to the control of the State's prison healthcare system, and Arizona's control of its budget. Based on a misguided review of ADCRR's recent activity, a court-appointee is now granted the authority to usurp core state functions without a proper justification.

Although the District Court applies a test that the Ninth Circuit itself has not previously relied on, it nonetheless fails to meet the standards under that test. Ordering the "extreme" remedy of a receiver requires showing that *seven* different factors are met. The District Court's February 19, 2026, Order granting the Motion for a Receiver (1-ER-17–99, the "Preliminary Order"), and July 17, 2026, Order appointing the Receiver (1-ER-2–15, the "Order") fail to fully consider those factors as they fail to evaluate recent progress made by ADCRR (in coordination with the Legislature) to resolve one of the most complex aspects of state administration—prison healthcare.

And while the District Court fails to properly evaluate the appointment of a receiver under the *Plata* test, it also failed to consider the impact it has on the division between state and federal powers. The receivership invades an area that falls within

the purview of the State, not the courts. And in doing so, the District Court constricts the Legislature's budget by granting nearly unlimited authority—and funds—to a court appointee.

This failure to consider the full scope of ADCRR's actions weighs against appointing a receiver, and warrants overturning the District Court's Order.

## ARGUMENT

### I. Interests of the Amicus Curiae.[1]

*Amici Curiae* Arizona House of Representatives Speaker Steve Montenegro and Arizona State Senate President Warren Petersen (the "Legislature") have a direct and substantial institutional interest in this appeal that is distinct from the interests of any existing party. The District Court's Order appoints a Receiver over all ADCRR health care operations and expressly directs the Receiver to "engage in essential efforts to secure adequate funding in consultation with . . . the Governor, and the Legislature." (1-ER-4–5.) The Order further provides that the Receiver "shall establish the budget required for all ADCRR health care" and shall possess "all authority vested by law in the Director of ADCRR relating to the financing of the prison health care system." (1-ER-4–5, 8.) As a consequence, the Legislature will be compelled to work directly with, and respond to the budgetary demands of,

[1] The Legislature received consent from all parties in filing this brief. The Legislature's counsel authored this brief in its entirety. No person other than the Legislature contributed money that was intended to fund the preparation and submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

an unelected court-appointed officer exercising authority that the Arizona Constitution vests exclusively in the Legislature. See Ariz. Const. art. IX, § 5 ("No money shall be paid out of the state treasury, except in the manner provided by law.").

The Order's budget-dispute mechanism (1-ER-15) provides that if the Receiver identifies funding needs that go unmet, the Receiver or any party may request resolution by the District Court, which "may . . . order the waiver of Arizona State laws, regulations, and contracts" that the District Court determines interfere with the receivership's objectives. The Order specifically contemplates the override or circumvention of two duly enacted Arizona statutes—the law requiring privatization of correctional health care, H.B. 2010, 49th Leg., 3d Spec. Sess. (Ariz. 2009), and A.R.S. § 41-1608, capping specialist compensation within the state correctional system. (1-ER-12.) These are legislative policy choices enacted through Arizona's democratic process. The Legislature accordingly has a concrete, practical interest in ensuring that any receivership order comports with the constitutional limits on judicial power and respects the separation of powers between the federal judiciary and co-equal branches of state government.

The Legislature's perspective is distinct from that of Defendants-Appellants because it speaks to the structural constitutional injury to the legislative branch's appropriations power and lawmaking authority—an interest that is not adequately

represented by any existing party. Defendants understandably focus on the operational disruption to ADCRR and the scope of its own authority; the Legislature's concern, by contrast, is with the fundamental integrity of the appropriations process under the Arizona Constitution and the preservation of the Legislature's exclusive authority to make, amend, and repeal the laws of this State. *See Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened" when "a federal court decree has the effect of dictating state . . . budget priorities," because states "have limited funds" and "order[ing] that . . . money be appropriated for one program" necessarily "take[s] funds away from other important programs."); *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) ("[A] structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources.").

The Legislature files this brief to ensure that the Court has before it the institutional voice of the branch whose constitutional prerogatives are most directly threatened by the Order's budgetary and lawmaking provisions, and to urge that the Order be overturned.

## II. <u>The Receivership Standard is Not Met.</u>

While Sections III and IV discuss factors uniquely within the Legislature's purview, the Legislature first recounts the distance between the District Court's Order, and the applicable standard for a receivership. While federal courts recognize

that a receivership is a high bar, the District Court here threw caution to the wind and forced through an "extraordinary" appointment where none was justified.

The Legislature therefore supports ADCRR's Opening Brief and seconds the arguments made therein. But the Legislature writes separately because the District Court's ruling infringes on its sovereign authority, including its power of the purse.

**a. A Receivership is Highly Intrusive and Only Available as the Last Remaining Remedy.**

The appointment of a receiver over a state governmental function is among the most intrusive remedies available to a federal court and is "warranted only by the most compelling circumstances." *D.C. v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. App. 1999). A "[r]eceivership is typically the last resort after all other less intrusive remedies have been exhausted." *L.A. All. for Human Rights v. City of Los Angeles*, 792 F. Supp. 3d 1049, 1092 (C.D. Cal. 2025). A court must exercise the utmost caution before imposing this "extreme and invasive equitable remedy." *Id*. (quoting *Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024)).

This caution is reinforced by the Prison Litigation Reform Act ("PLRA"), which Congress enacted "to limit the oversight of state prisons by federal courts." *Parker v. Hooper*, 171 F.4th 736, 750 (5th Cir. 2026). Under the PLRA, prospective relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A). A receivership—which effectively strips

state officials of operational control over a core governmental function—must therefore be the remedy of last resort.

In deciding whether this standard was met, the District Court applied the seven-factor test drawn from *Plata v. Schwarzenegger*, No. C01–1351 TEH, 2005 WL 2932253, at *23–24 (N.D. Cal. Oct. 3, 2005), which examines: (1) grave and immediate threat or actuality of harm; (2) exhaustion or futility of less extreme measures; (3) whether continued compliance efforts lead only to confrontation and delay; (4) lack of leadership to turn the tide; (5) bad faith or indifference; (6) waste of substantial resources without meaningful progress; and (7) whether a receiver would provide a relatively quick and efficient remedy.

Assuming *arguendo* that *Plata* applies,[2] the District Court did not properly evaluate its factors, and does not meet the high bar for imposing a receiver.

**b. The Record Does Not Satisfy the Demanding Receivership Standard.**

Against a demanding standard for the appointment of a receiver, the record falls flat. Initially, the Order's purported thoroughness does not immunize it from

---

[2] The Ninth Circuit has not adopted this seven-factor test as binding circuit precedent. The test originated in the district court's findings in *Plata*, 2005 WL 2932253, at *23–24. And while the Ninth Circuit's decision in *Plata v. Brown*, 603 F.3d 1088 (9th Cir. 2010) affirmed the appointment of a receiver, it did so under a deferential abuse-of-discretion standard and did not itself announce or adopt the seven-factor framework as a binding, circuit-wide receivership test. The District Court's application of this test as though it were settled Ninth Circuit doctrine is therefore subject to challenge, and this Court should clarify the applicable standard on review.

reversal. The question on appeal is whether the District Court correctly applied the demanding receivership standard—not whether it comprehensively detailed the opinions of the monitoring team.

In evaluating these opinions, the record here is materially distinguishable from *Plata*. There, the district court appointed a receiver only after thirteen-plus years of total noncompliance with consent decrees, findings of complete absence of leadership, documented bad faith—including the destruction of evidence and concealment of deaths—and proof that hundreds of millions of dollars had been spent with no meaningful improvement. *Plata*, 2005 WL 2932253, at *1–22. The Ninth Circuit affirmed, finding the record supported the conclusion that a receivership was the only remaining option. *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010). Critically, in *Plata*, the defendants did not oppose the receivership, proposed no alternative remedies, and effectively conceded they were incapable of curing the constitutional violations. *Plata*, 2005 WL 2932253, at *28. None of those circumstances are present here.

To the contrary, a receiver is not justified when the District Court only gave ADCRR a few years to fix one of the most complicated healthcare administration challenges in the State's purview. Indeed, the District Court is giving the Receiver *five years* to accomplish what ADCRR could not do in three. Thus, a receiver is not justified because (1) ADCRR has demonstrated substantial progress in addressing

the District Court's injunction, (2) ADCRR's disagreement with the monitors does not establish bad faith, (3) there is not entrenched non-compliance with the injunction, and (4) courts should refrain from displacing state officials based on pre-judgment shortcomings.

### 1. ADCRR Has Demonstrated Measurable, Recent Progress

Unlike *Plata*, ADCRR has demonstrated measurable, recent progress toward compliance—progress that the district court largely disregarded. The Legislature has particular insight into this progress, having provided the very appropriations that made much of it possible.

As ADCRR discusses in its Opening Brief (at 11), since the 2023 Injunction, ADCRR's overall healthcare staffing has increased by 56%, the number of full-time physicians has increased by 46%, and midlevel providers who serve as primary care providers have increased by 93%. (*See* 2-ER-168; 3-ER-293–294.) The Patient Centered Care Model ("PCCM") has been rolled out to 31 of 43 units, with systemwide implementation targeted by the end of 2026. (2-ER-188–189 ¶¶ 3–4.) Additionally, ADCRR has spent over $60 million providing Hepatitis C treatments to over 4,500 inmates, implemented a treatment program for roughly 7,000 inmates with Opioid Use Disorder, and significantly increased offsite specialty-care appointments. (*See* 5-ER-894–896.)

These record improvements—largely disregarded by the District Court—

confirm that the Order rests on an incomplete assessment of ADCRR's trajectory toward compliance. It is error under the PLRA to "fail[] to incorporate significant medical care improvements" before ordering prospective relief. *Parker*, 171 F.4th at 757–58. The objective data is clear: staffing is up dramatically, spending has more than doubled, and the PCCM is being rolled out on a published, ongoing schedule adding roughly one new unit every two weeks. That vacancies and implementation gaps remain does not establish that less extreme measures have been exhausted where ADCRR is actively closing those gaps. Neither Plaintiffs nor the District Court identify a comparable case ordering a receivership notwithstanding this magnitude of documented, ongoing progress.

**2. Disagreement with Monitors Does Not Establish Bad Faith.**

The fact that ADCRR has disagreements with the court-appointed Monitors' recommendations, or that it is continuing to work toward full compliance, does not establish bad faith. Courts addressing similar institutional-reform records have declined to equate noncompliance—or good-faith objections to monitor findings—with bad faith. *See Armstrong v. Brown*, 768 F.3d 975, 987–88 (9th Cir. 2014) (a party may seek district court review of a court-appointed expert's recommendations); *United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *12 (S.D. Miss. Jan. 30, 2023) (declining to find bad faith despite years of noncompliance); *Nunez v. N.Y.C. Dep't of Corr.*, 782 F. Supp. 3d

146, 165 (S.D.N.Y. 2025) (same).

As the Ninth Circuit has recognized, court-appointed experts' recommendations are "subject to review by the district court," and "a party dissatisfied with the [court-appointed] expert's recommendations [may] obtain district court review of that recommendation." *Armstrong*, 768 F.3d at 987–88. ADCRR had the right to object to the Monitors' recommendations and conclusions, and exercising that right is not an act of bad faith.

### 3. ADCRR's Improvements Do Not Reflect Truly Entrenched Noncompliance.

When the receivership standard has been satisfied, it is in cases of truly entrenched, multiyear—or multidecade—noncompliance with no corrective effort whatsoever. In *Hutto v. Finney*, 437 U.S. 678, 683–84 (1978), the Supreme Court approved a comprehensive judicial decree governing the running of a major institution only after years of persistent, unremedied unconstitutional conditions and repeated failures to comply with prior orders. Similarly, in *United States v. Hinds County Board of Supervisors*, 128 F.4th 616, 636–37 (5th Cir. 2025), the Fifth Circuit found a receivership could be an appropriate contempt remedy, but only where the record showed repeated, unremedied contempt and a total failure of corrective effort.

Those circumstances are not present here. ADCRR is actively engaged in remedial efforts and the Legislature has increased appropriations to support

compliance.[3] ADCRR's current leadership has held its position for approximately three years and, in that time, has overseen substantial increases in funding, staffing, and inmate services—precisely the kind of demonstrated capacity to "turn the tide" that counsels against imposing a receivership. (*See* 2-ER-174–175.) Isolated staffing gaps do not negate three years of measurable, systemwide progress in funding, staffing, and inmate services under the same leadership team, including significant progress on the custody side of the injunction that is not subject to a receiver.

Far from "entrenched noncompliance," ADCRR has worked closely with the Legislature to ensure funding goals are met, and ensure that real progress is made.

**4. Courts Should Not Displace State Officials Based on Past Shortcomings Rather Than Present Capacity.**

Courts should be particularly cautious about displacing state officials based on a snapshot of past shortcomings rather than present and prospective capacity. As the Supreme Court has cautioned, federal courts must guard against "substitut[ing] . . . policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Horne*, 557 U.S. at 455.

This admonition carries particular weight here, where the Order focuses disproportionately on pre-injunction conduct rather than ADCRR's current trajectory. The District Court focused on events between 2014 and 2022—before the

[3] *See infra* Section IV.b, discussing recent increases in appropriations.

2022 finding of unconstitutionality, before the 2023 Injunction, and before the current leadership assumed responsibility at ADCRR. (1-ER-70–72.) Yet, since 2023, the court did not impose intermediate remedies to improve compliance before resorting to the "last resort" of a receivership. The failure to use less drastic remedies before appointing a receiver over a core state function presents a serious question for appellate review. *See, e.g.*, *Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 624 (affirming receivership only where the district court had twice before held the county defendant in contempt); *Nunez*, 782 F. Supp. 3d at 156 (imposing receivership only after contempt orders to comply proved insufficient).

* * *

The Order incorrectly applied the demanding receivership standard under the PLRA and failed to fully consider ADCRR's substantial compliance progress over the past three years. These unconsidered factors have a marked effect not only on ADCRR's healthcare administration, but also on the Legislature's ability to act within the framework of the Arizona Constitution. The receivership should be overturned as a result.

## III. <u>Federalism Principles Warrant Overturning the Receivership.</u>

In addition to the merits of ADCRR's challenge to the receivership standard, bedrock federalism principles independently warrant overturning the Order. The receivership does not merely correct a discrete constitutional violation—it displaces

the State's sovereign authority over a core governmental function, dictates state budgetary priorities, and threatens to nullify duly enacted Arizona statutes. These structural constitutional injuries are central to the Legislature's interests.

**a. Prison Administration Stands at the Apex of Sovereign State Authority.**

The Supreme Court has repeatedly recognized that prison administration represents one of the most sensitive arenas of state sovereignty. "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973). For this reason, "[p]rinciples of federalism and separation of powers dictate that exclusive responsibility for administering state prisons resides with the State and its officials." *Lewis v. Casey*, 518 U.S. 343, 363 (1996) (Thomas, J., concurring); *see also id*. at 386 (reversing systemwide injunction exceeding the scope of proven injury and failing to accord deference to prison administrators).

The intrusion effected by a receivership, which entirely displaces an elected official, is categorically more severe than an ordinary injunction. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Trump v. Casa*, 606 U.S. 831, 859 (2025) (a court causes irreparable harm when it wrongly "prevents the Government

from enforcing its policies”). The receivership does not merely enjoin Arizona officials—it transfers all operational authority over ADCRR’s entire healthcare system to an unelected federal agent for a minimum of five years.

The Order fully displaces ADCRR’s director in favor of a receiver that exists fully independent of democratic accountability. This strikes at the heart of the Legislature’s sovereign authority.

**b. Heightened Deference to Prison Administration Is Firmly Established.**

The principle of deference to state prison administrators is not merely aspirational—it is a cornerstone of this Court’s institutional-reform jurisprudence. In *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974), the Supreme Court explained that federal courts have “traditionally…adopted a broad hands-off attitude toward problems of prison administration” because such problems “are complex and intractable” and “require[] expertise, [comprehensive] planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.” Similarly, the Court in *Turner v. Safley*, 482 U.S. 78, 89 (1987), held that deference is required because prison officials—“and not the courts”—must “make the difficult judgments concerning institutional operations.”

Even those Justices who have endorsed structural reform have acknowledged its limits: “Three years of law school and familiarity with pertinent Supreme Court

precedents give no insight whatsoever into the management of social institutions." *Brown v. Plata*, 563 U.S. 493, 558 (2011) (Scalia, J., dissenting). Most recently, the Fifth Circuit recognized that federal judges are not suited, "by training or temperament, to manage institutions, personnel, or the provision of vital state services." *M.D. by Stukenberg v. Abbott*, 119 F.4th 373, 395 (5th Cir. 2024).

These principles apply with special force here, where the District Court has effectively transferred management of a statewide prison healthcare system—serving more than 25,000 inmates across nine complexes—to a single court-appointed officer.

**c. The Order's Control Over Budgetary Authority Further Infringes on the State's Authority.**

The Supreme Court has made clear that "[f]ederalism concerns are heightened" when "a federal court decree has the effect of dictating state . . . budget priorities," because states "have limited funds" and "[ordering] that money be appropriated for one program" necessarily "take[s] funds away from other important programs." *Horne*, 557 U.S. at 448. A "structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds . . . at the expense of other citizens, other government programs, and other institutions not represented in court." *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring).

Moreover, even when transfers are effectuated, courts must also ensure that

"responsibility for discharging the State's obligations is returned promptly to the State." *Frew v. Hawkins*, 540 U.S. 431, 442 (2003); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992) (courts must give "significant weight to the views of the local government officials" and consider fiscal constraints).

Here, the Order imposes a receivership for a minimum of five years (1-ER-13)—two years longer than the time ADCRR had under the injunction—with no assurance of timely return of authority. It also establishes a broad scope within those five years, providing that the Receiver "shall establish the budget required for all ADCRR health care" (1-ER-4–5) and granting the Receiver "all authority vested by law in the Director of ADCRR relating to the financing of the prison health care system." (1-ER-8.) This directly displaces the Legislature's appropriations authority under the Arizona Constitution. *See* Ariz. Const. art. III, art. IX, § 5.

The Legislature has competing statewide budgetary obligations spanning education, public safety, health and human services, infrastructure, and other core functions. The Order fails to acknowledge that ordering unlimited expenditure on one program necessarily diverts resources from others—precisely the harm the Supreme Court identified in *Horne*. 557 U.S. at 448. That the Order sets aside $2.2 million in contempt funds does not offset the Receiver's far broader authority to direct all of ADCRR's healthcare expenditures, for which the State must indemnify her. (*See e.g.,* 1-ER-8, 11–14.)

This incursion on constitutionally delegated authority occurs the moment the federal receiver displaces elected and appointed state officials from a core governmental function.

#### d. These Federalism Concerns Are Reinforced by Considerations of Democratic Accountability.

The Legislature's institutional concern is direct and concrete: as the constitutionally designated keeper of the State's purse, the Order compels the Legislature to work directly with, and respond to the budgetary demands of, a federal officer over whom it exercises no electoral or confirmatory authority. Where the Receiver is empowered to "establish the budget required for all ADCRR health care," and the Order's budget-dispute mechanism provides that unresolved funding needs may result in the court ordering "the waiver of Arizona State laws, regulations, and contracts" (1-ER-15), the Legislature's sovereign lawmaking authority is directly at risk.

This arrangement—whereby an unelected federal official determines budgetary requirements and a federal court stands ready to override state law if the Legislature disagrees—inverts the constitutional structure and deprives Arizona's citizens of democratic accountability over their state's fiscal priorities. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Specifically, the Order does not limit itself to directing operational changes within the existing statutory framework—it expressly contemplates the nullification of at least two duly enacted Arizona statutes. (*See* 1-ER-12 (referencing (1) the law requiring privatization of correctional health care, H.B. 2010, 49th Leg., 3d Spec. Sess. (Ariz. 2009); and (2) A.R.S. § 41-1608, capping specialist compensation within the state correctional system).)

These are legislative policy choices enacted through Arizona's democratic process. A federal court cannot properly override or nullify them absent a specific finding that each statute independently causes a constitutional violation—a finding the district court has not made. Rather than identifying a constitutional basis for displacing these statutes, the District Court uses their potential termination as leverage to enforce compliance with its Order—effectively strong-arming both the Legislature and ADCRR into submission to an unjustified receivership.

This Court should not permit a federal district court to hold the Legislature's enactments hostage pending compliance with a remedial order whose legal basis is unfounded. *See Horne v. Flores*, 557 U.S. at 455 (cautioning against "substitut[ing] . . . policy judgments for those of the state and local officials to whom such decisions are properly entrusted").

* * *

Federalism principles independently support overturning the Order on appeal,

as it effects an extraordinary displacement of state sovereignty in favor of an unelected—and unchecked—court appointee.

## IV. <u>The Scope of the Receivership Violates Autonomy Over the State's Budget.</u>

Even assuming arguendo that some form of receivership could be justified on this record, the scope of budgetary authority conferred on the Receiver by the Order is constitutionally impermissible. The Order provides that the Receiver "shall establish the budget required for all ADCRR health care" (1-ER-4–5) and vests the Receiver with "all authority vested by law in the Director of ADCRR relating to the financing of the prison health care system." (1-ER-8.) This directly usurps the Arizona Legislature's exclusive appropriations authority under Article IX of the Arizona Constitution, which provides that "no money shall be paid out of the state treasury except in the manner provided by law." Ariz. Const. art. IX, § 5. From the Legislature's institutional perspective, the District Court's remedy—however well-intentioned—cannot constitutionally bypass the appropriations process that the people of Arizona entrusted to their elected representatives.

### a. A Receiver Cannot Be Given Unreviewable Budget Authority.

When a court appoints a receiver for a government entity, budget considerations must be at the forefront of any analysis. In *Hinds County*, the district court appointed a receiver over a county detention facility and granted that receiver authority to "determine the annual RDC budget, including for staff salaries and

benefits, medical and mental health services . . . physical plant improvements, fire safety, and any other remedies needed to address the constitutional deficiencies documented in this case." 128 F.4th at 638.

On review, however, the circuit court held that vesting such budget authority in a receiver "goes beyond the limitations imposed by the PLRA." *Id*. at 638 (citing *Guajardo v. Fed. Bureau of Prisons*, 363 F.3d 392, 394 (5th Cir. 2004)). The court reasoned that granting the receiver "power to set RDC's budget, subject to the district court's approval, would allow the receiver to ignore the budgetary constraints" faced by the elected governing body—and that this would not only "burden . . . the government's budget," but also improperly "assume a responsibility that should be left for the legislature." *Id*. (quoting *Valentine v. Collier*, 993 F.3d 270, 294–95 (5th Cir. 2021) (Oldham, J., concurring)).

The circuit court therefore remanded with instructions that "the district court cannot grant the receiver power over RDC's budget and related financial matters, such as salaries and benefits, and the court should develop a new description of the receiver's powers after conducting a need-narrowness-intrusiveness analysis and in light of the receiver's loss of control over the budget and salaries." *Hinds Cnty*., 128 F.4th at 638–39.

The same analysis applies here with even greater force. In *Hinds County*, the entity whose budget was commandeered was a county board of supervisors. Here,

the District Court's Order displaces the appropriations authority of a sovereign state legislature. If the PLRA forbids vesting budget authority in a receiver over a county detention facility, it *a fortiori* forbids doing so over a state prison system, where the federalism concerns the Supreme Court has identified are at their zenith. *See Horne*, 557 U.S. at 448 ("Federalism concerns are heightened" when "a federal court decree has the effect of dictating state . . . budget priorities.").

**b. The Order Disregards the Legislature's Competing Statewide Obligations.**

The Legislature has competing statewide budgetary obligations spanning education, public safety, health and human services, infrastructure, and other core functions. The District Court's Order fails to acknowledge the Supreme Court's longstanding recognition that "[ordering] that money be appropriated for one program" necessarily "take[s] funds away from other important programs." *Horne*, 557 U.S. at 448. A "structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds . . . at the expense of other citizens, other government programs, and other institutions not represented in court." *Missouri*, 515 U.S. at 131.

The Legislature does not have—and the Order should not be read to impose—an unlimited appropriations obligation or "blank check" for ADCRR health care, unmoored from the normal legislative budget process. The Constitution vests the power of the purse in the Legislature precisely so that elected representatives,

accountable to the people of Arizona, can weigh competing demands and allocate finite resources accordingly.

The Joint Legislative Budget Committee ("JLBC") has provided data showing appropriations from FY 2013 through FY 2027, in which the Legislature appropriated approximately $3.5 billion in dedicated funding for ADCRR inmate health care.

**ADC Inmate Health Care Funding**
**FY 2013-FY 2027**

| Fiscal Year | Inmate Health Care Contracted Services | Medical Staffing Augmentation | Non-Contract Medication | Injunction-Related IT Upgrades | Jensen v. Thornell Compliance | Total Funding |
|---|---|---|---|---|---|---|
| 2013 | $130,274,900 | $0 | $0 | $0 | $0 | $130,274,900 |
| 2014 | 125,274,900 | 0 | 0 | 0 | 0 | 125,274,900 |
| 2015 | 125,274,900 | 0 | 0 | 0 | 0 | 125,274,900 |
| 2016 | 147,203,900 | 0 | 0 | 0 | 0 | 147,203,900 |
| 2017 | 149,837,100 | 0 | 0 | 0 | 0 | 149,837,100 |
| 2018 | 148,811,700 | 0 | 0 | 0 | 0 | 148,811,700 |
| 2019 | 163,811,700 | 0 | 0 | 0 | 0 | 163,811,700 |
| 2020 | 194,711,700 | 0 | 0 | 0 | 0 | 194,711,700 |
| 2021 | 194,711,700 | 0 | 0 | 0 | 0 | 194,711,700 |
| 2022 | 203,173,100 | 15,000,000 | 0 | 0 | 0 | 218,173,100 |
| 2023 | 269,681,300 | 0 | 0 | 0 | 0 | 269,681,300 |
| 2024 | 333,223,300 | 0 | 40,746,500 | 4,770,300 | 0 | 378,740,100 |
| 2025 | 376,978,900 | 0 | 18,000,000 | 2,800,000 | 0 | 397,778,900 |
| 2026 | 371,499,400 | 0 | 15,000,000 | 2,400,000 | 0 | 388,899,400 |
| 2027 | 0 | 0 | 0 | 0 | 451,390,400 | 451,390,400 |
| **Total** | **$2,934,468,500** | **$15,000,000** | **$73,746,500** | **$9,970,300** | **$451,390,400** | **$3,524,575,700** |

Since FY 2013's $130,274,900 allocation, the Legislature has steadily increased annual funding for ADCRR to $451,390,400 in FY 2027, an increase of more than ***246%***. These appropriations underscore that the normal budget process is functioning. Resolving alleged issues with ADCRR's healthcare system is not an overnight fix. Despite this, the District Court decided that after only *three* years, ADCRR is incapable of meeting imposed standards—while simultaneously giving its appointed receiver a minimum of *five* years to achieve compliance.

This failure to account for the Legislature's demonstrated and ongoing commitment to increased ADCRR healthcare funding is itself a basis for reversal.

**c. The Receiver Should Not Be Empowered to Spend Without Legislative Authorization or Oversight.**

The Order's budget-dispute provision (§ VI.b) provides that when the Receiver determines available funds are inadequate, the Receiver shall first consult the Director of ADCRR, then notify the Legislature and the Governor's Office. But critically, if the funding dispute remains unresolved, the court "may . . . order the waiver of Arizona State laws, regulations, and contracts." (1-ER-15.) This mechanism effectively circumvents the appropriations process and creates a pathway for judicial override of legislative spending decisions. Such a mechanism is constitutionally impermissible. *See Missouri*, 515 U.S. at 99, 131.

**d. The Order Will Increase Costs Without Reaching the Injunction's Goals.**

California's experience with the *Plata* receivership serves as a cautionary tale. More than *twenty years* after appointing a receiver over California's prison health care system, the receiver has not achieved compliance with constitutional standards. (5-ER-909–913.) Yet the receivership has cost that state billions in administrative overhead, inflated compensation, attorneys' fees, and outside consultant costs—without resolving the underlying systemic issues. Third parties operating under a receiver should not reap a windfall when such monies should address actual

healthcare issues. While California's total inmate population fell by roughly half, its annual inmate health care budget increased by 353%. (5-ER-909–913.) In the first five years alone, annual health care costs ranged from approximately $11 million to $93 million—funds beyond legislative control. (2-ER-152.)

California is not alone in its receivership struggles. In *Pugh v. Locke*, the court declared Alabama's entire prison system unconstitutional and imposed sweeping remedial standards. 406 F. Supp. 318 (M.D. Ala. 1976). When the state failed to comply, the court appointed a receiver. *See Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979). However, after exorbitant costs, the receivership "ultimately failed to resolve major issues in the prison system…." *See* Laura Weingart, *Judicial Remedies of Last Resort: Receiverships in the Prison Litigation Context*, 9 Cardozo Pub. L. Pol'y & Ethics J. 193, 211 (2010). And in Arizona, the Maricopa County Sheriff's Office ("MCSO") has operated under a court-appointed monitor since 2013. *See Melendres v. Sheridan*, No. CV-07-2513-PHX-GMS, Doc. 3263 (D. Ariz. Oct. 8, 2025). The unfettered spending by the monitor in that case has raised significant concerns in Arizona as to financial liberties taken by court-appointees in expending monies for administrative costs with little oversight. *See* P. Jackson, *Court-Appointed Monitor Spends Tens of Millions While Leaving Taxpayers in the Dark*, Goldwater Institute, https://www.goldwaterinstitute.org/court-monitor.

Under the Order, "[a]ll costs incurred during the Receivership shall be borne by Defendants, including all the costs for establishing and maintaining the Office of the Receiver." (1-ER-11.) The State must unconditionally "defend and indemnify the Receiver and the Receiver's personnel . . . in any litigation, causes of action, claims, liabilities, damages, losses, costs and expenses." (1-ER-13.) The Order sets the Receiver's salary at $500,000 per year (1-ER-9) and authorizes the Receiver to hire staff and consultants outside normal state procurement and civil-service structures. (1-ER-6–7.) These provisions guarantee that the receivership will operate at inflated costs compared to ADCRR's existing operations.

Arizona should not suffer the same quagmire as California. Executive authorities granted to the Receiver need to be checked by government appropriation safeguards, especially to prevent receiver entourages from draining the till. Such open-ended liability is untenable.

* * *

In sum, the receivership as ordered duplicates ADCRR's existing administrative functions at far greater expense rather than addressing the underlying compliance challenges—particularly where ADCRR has already demonstrated measurable progress on staffing, health care funding, treatment expansion, and substance-use-disorder programming.

The PLRA requires the court to employ the "least intrusive means" to address

constitutional violations. 18 U.S.C. § 3626(a)(1)(A). A receivership vested with sweeping budgetary authority, inflated compensation structures, and the power to override state law cannot satisfy that standard. *See Hinds Cnty.*, 128 F.4th at 638–39 (holding that budget authority exceeded PLRA limits and remanding for a proper need-narrowness-intrusiveness analysis). If the *Hinds County* court could not vest budget authority in a receiver over a single county jail, this Court should not permit it over Arizona's entire state prison healthcare system.

## CONCLUSION

For the foregoing reasons, the District Court's Order appointing a receiver over ADCRR's healthcare operations should be reversed. The Order fails to satisfy the demanding receivership standard under the PLRA and controlling precedent, disregarding ADCRR's measurable, ongoing progress in staffing, funding, and inmate healthcare services. It intrudes upon core principles of federalism by displacing Arizona's sovereign authority over prison administration—a function the Supreme Court has repeatedly recognized as lying at the apex of state sovereignty. And by vesting an unelected federal officer with sweeping budgetary authority, including the power to override duly enacted Arizona statutes, the Order usurps the Legislature's exclusive constitutional prerogative over appropriations and fundamentally disrupts democratic accountability.

This Court should overturn the receivership and restore the administration of Arizona's prison healthcare system to its elected and appointed state officials.

Date: September 22, 2026

SNELL & WILMER L.L.P.

*/s/Joseph Kanefield*
Joseph Kanefield (Bar No. 015838)
Brett W. Johnson (Bar No. 021527)
Cole Craghan (Bar No. 038614)
Snell & Wilmer LLP
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: (602) 382-6000
jkanefield@swlaw.com
bwjohnson@swlaw.com
ccraghan@swlaw.com

*Attorneys for Amici Curiae House Speaker Steve Montenegro and Senate President Warren Petersen*

# CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the word limit of Ninth Circuit Rule 32-1 because this brief contains 5,757 words, excluding the items exempted by Fed. R. App. P. 32(f). This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: September 22, 2026

SNELL & WILMER L.L.P.

*/s/Joseph Kanefield*

Joseph Kanefield (Bar No. 015838)
Brett W. Johnson (Bar No. 021527)
Cole Craghan (Bar No. 038614)
Snell & Wilmer LLP
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: (602) 382-6000
jkanefield@swlaw.com
bwjohnson@swlaw.com
ccraghan@swlaw.com

*Attorneys for Amicus Curiae House Speaker Steve Montenegro and Senate President Warren Petersen*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system.

Date: September 22, 2026

SNELL & WILMER L.L.P.

*/s/Joseph Kanefield*

Joseph Kanefield (Bar No. 015838)
Brett W. Johnson (Bar No. 021527)
Cole Craghan (Bar No. 038614)
Snell & Wilmer LLP
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: (602) 382-6000
jkanefield@swlaw.com
bwjohnson@swlaw.com
ccraghan@swlaw.com

*Attorneys for Amicus Curiae House Speaker Steve Montenegro and Senate President Warren Petersen*