**No. 26-1746**
**(consolidated with 26-5060)**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

SHAWN JENSEN, ET AL,

*Plaintiffs-Appellees*,

v.

RYAN THORNELL, ET AL,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona, Phoenix
No. 2:12-CV-00601-ROS
Hon. Roslyn O. Silver

---

# APPELLEES' ANSWERING BRIEF

---

Donald Specter
Sophie Hart
Rosalind Dillon
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621

David C. Fathi
Maria V. Morris
**ACLU NATIONAL PRISON PROJECT**
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
(202) 393-4930

Corene T. Kendrick
**ACLU NATIONAL PRISON PROJECT**
425 California St., 7th Floor
San Francisco, CA 94104
(202) 393-4930

Tara DeGeorge
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, AZ 85006
(602) 650-1854

*Attorneys for Prisoner Class Plaintiffs-Appellees*

Maya S. Abela
Rose Daly-Rooney
**DISABILITY RIGHTS ARIZONA**
4539 E. Fort Lowell Rd.
Tucson, AZ 85712
(520) 327-9547

*Attorneys for Plaintiff-Appellee Disability Rights Arizona*

## TABLE OF CONTENTS

INTRODUCTION ....... 1
ISSUES PRESENTED ....... 2
STATEMENT OF THE CASE ....... 2
- I. Complaint and 2014 Stipulation ....... 2
- II. Trial and Permanent Injunction ....... 4
- III. Post-Injunction Compliance Efforts ....... 6
  - A. First Interim Report (February 2024) ....... 6
  - B. Special Report on Five Suicides (October 2024) ....... 7
  - C. Second Interim Report (January 2025) ....... 8
  - D. Staffing Pilot Project (July 2024 to January 2025) ....... 8
- IV. Motion for Receiver ....... 12
  - A. Third Interim Report (July 2025) ....... 12
  - B. Appointment of Receiver ....... 14

SUMMARY OF THE ARGUMENT ....... 16
STANDARD OF REVIEW ....... 19
ARGUMENT ....... 21
- I. The District Court Did Not Abuse Its Discretion by Appointing a Receiver. ....... 22
  - A. ADCRR's Fourteen-Year History of Intransigence Obviously Bears on the Question of Whether a Receiver Is Necessary. ....... 22
  - B. The District Court Did Not Err in Finding ADCRR Had Sufficient Opportunity to Demonstrate It Would Comply With the Injunction. ....... 27
  - C. The District Court Did Not Abuse Its Discretion by Appointing a Receiver Despite ADCRR's Assertions of Recent Progress. ....... 33
  - D. ADCRR's Remaining Challenges to the District Court's Exercise of Its Discretion Fall Flat. ....... 39
  - E. Receivership is an Available Remedy. ....... 50
- II. The Appointment Order Does Not Exceed the Limits of the PLRA or Federal Courts' Equitable Authority Because It Intrudes on State Authority Only Where Necessary. ....... 58

A. The District Court Did Not Authorize the Receiver to Bypass State Law Without Meeting the PLRA....................................................59

B. The Appointment Order Does Not Permit the Receiver or District Court to "Commandeer Arizona's Constitutional Appropriations" Process. ...........................................................................................60

CONCLUSION ..............................................................................................62

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 55

*Armstrong v. Newsom*,
58 F.4th 1283 (9th Cir. 2023) .......... 21

*Benjamin v. Fraser*,
343 F.3d 35 (2d Cir. 2003) .......... 57

*Bounds v. Smith*,
430 U.S. 817 (1977) .......... 58

*Brown v. Bailey*,
No. 78-3046 (S.D. W. Va. June 5, 1981) .......... 56

*Brown v. Plata*,
563 U.S. 493 (2011) .......... *passim*

*Caiozzo v. Koreman*,
581 F.3d 63 (2d Cir. 2009) .......... 57

*Can. Life Assurance Co. v. LaPeter*,
563 F.3d 837 (9th Cir. 2009) .......... 20

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) .......... 40

*Coleman v. Newsom*,
No. 2:90-cv-0520, 2025 WL 2475040 (E.D. Cal. Aug. 27, 2025) .......... 56

*Coleman v. Newsom*,
No. 2:90-cv-0520, 2025 WL 3693004 (E.D. Cal. Dec. 19, 2025) .......... 60

*Connett v. City of Jerseyville*,
110 F.2d 1015 (7th Cir. 1940) .......... 55

*Detrich v. Schriro*,
No. 03-CV-229, 2006 WL 3735965 (D. Ariz. Nov. 30, 2006) ....................................40

*Digit. Media Sols., LLC v. S. Univ. of Ohio, LLC*,
59 F.4th 772 (6th Cir. 2023) ..........................................................................55

*Dist. of Columbia v. Jerry M.*,
738 A.2d 1206 (D.C. 1999) ..........................................................................39

*Dixon v. Barry*,
967 F. Supp. 535 (D.D.C. 1997)........................................................ 48, 58, 60, 61

*Felder v. Casey*,
487 U.S. 131 (1988)..........................................................................................54

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004)..........................................................................................31

*Hashimoto v. Dalton*,
118 F.3d 671 (9th Cir. 1997) .........................................................................38

*Hook v. Ariz. Dep't of Corr.*,
107 F.3d 1397 (9th Cir. 1997)........................................................................59

*Hutto v. Finney*,
437 U.S. 678 (1978)................................................................................ 21, 24

*In re Mercury Interactive Corp. Secs. Litig.*,
618 F.3d 988 (9th Cir. 2010) .........................................................................51

*Inmates of D.C. Jail v. Jackson*,
No. 1:75-cv-01668, (D.D.C. July 11, 1995) ...................................................56

*Janes v. Wal-Mart Stores, Inc.*,
279 F.3d 883 (9th Cir. 2002) .........................................................................52

*Jensen v. Thornell*,
No. 25-4365, 2026 WL 2043607 (9th Cir. June 5, 2026)............................ 9, 23, 29

*Lady Broughton's Case*,
(1672) 83 Eng. Rep. 112; Raym. Sir T. 216 (KB)....................................................55

*Melendres v. Maricopa Cnty.*,
897 F.3d 1217 (9th Cir. 2018) ...........................................................................20

*Melendres v. Sheridan*,
No. 07-CV-2513, 2026 WL 411745 (D. Ariz. Feb. 13, 2026) ......................... 49, 50

*Meriwether v. Garrett*,
102 U.S. 472 (1880)...........................................................................................55

*New Marshal of the King's Bench Prison*,
(1768) 98 Eng. Rep. 138; 4 Burr. 2183 (KB) ......................................................55

*Newman v. Alabama*,
466 F. Supp. 628 (M.D. Ala. 1979) ............................................................ 29, 49, 56

*Nunez v. New York City Dep't of Corr.*,
782 F. Supp. 3d 146 (S.D.N.Y. 2025) ........................................................... 56, 60

*Parker v. Hooper*,
171 F.4th 736 (5th Cir. 2026) (en banc)................................................................38

*Parsons v. Ryan ("Parsons I")*,
754 F.3d 657 (9th Cir. 2014) ..............................................................................4

*Parsons v. Ryan ("Parsons II")*,
912 F.3d 486 (9th Cir. 2018) ................................................................ 4, 20, 25, 27

*Parsons v. Ryan ("Parsons III")*,
949 F.3d 443 (9th Cir. 2020) ..............................................................................4

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010) ...................................................................... 56, 57

*Plata v. Schwarzenegger*,
No. C01-1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) .......................... *passim*

*Plata v. Schwarzenegger*,
No. C01-1351, 2006 WL 8563430 (N.D. Cal. Feb. 14, 2006) ......................... 60, 61

*Rio Verde Plantas, LLC v. O&S Holdings, LLC*,
No. 3:25-cv-00098-JR, 2025 WL 1368639 (D. Or. Mar. 21, 2025)........................39

*Rouser v. White*,
825 F.3d 1076 (9th Cir. 2016) ..........................................................................24

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)............................................................................................50

*Shaw v. Allen*,
771 F. Supp. 760 (S.D. W. Va. 1990)..................................................................56

*Simenoff v. Hiner*,
249 F.3d 883 (9th Cir. 2001) ..............................................................................38

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ......................................................................... 31, 58

*Supervisors v. Rogers*,
74 U.S. 175 (1868)..............................................................................................55

*Taniguchi v. Schultz*,
303 F.3d 950 (9th Cir. 2002) ..............................................................................51

*Thornell v. Jensen*,
No. 26A370, 2026 WL 2975650 (U.S. Oct. 1, 2026) (Kagan, J.) ...........................16

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)......................................................................... 18, 51, 52, 57

*United States v. Hinds Cnty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) ............................................................ 20, 27, 32, 36

*United States v. Hinds Cnty.*,
No. 3:16-cv-489 (S.D. Miss. June 27, 2025), ECF No. 282-2 ...............................62

*United States v. Hinds Cnty.*,
No. 3:16-cv-489, 2022 WL 17408643 (S.D. Miss. Dec. 2, 2022)..........................27

*United States v. Hinds Cnty.*,
No. 3:16-cv-489, 2022 WL 3022385 (S.D. Miss. July 29, 2022), .................. 32, 56

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009)..........................................................................33

*United States v. Sineng-Smith*,
590 U.S. 371 (2020)..........................................................................................20

*Vega v. All My Sons Bus. Dev. LLC*,
583 F. Supp. 3d 1244 (D. Ariz. 2022) ..............................................................51

*Watson v. Cty. of Memphis*,
373 U.S. 526, 537 (1963)..................................................................................50

*Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Off.*,
444 N.W.2d 634 (Mich. Ct. App. 1989) .................................................. 29, 32, 37

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ......................................................................................25

**Statutes**

18 U.S.C. § 3626 ..............................................................................................59

Act of April 18, 1795, § 4, *reprinted in* 15 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 at 355–56 (Hampton L. Carsons et al. eds., 1903)..........................................................................................................53

Act of Dec. 25, 1789, ch. 44, § 10, *reprinted in* LAWS OF MARYLAND, 1785-1791, 426, 427 (Annapolis, Frederick Green 1790) ..............................................54

Act of Feb. 5, 1827, § 6, *reprinted in* LAWS OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD, 1829, INCLUSIVE, 448–49 (Willard Hall ed., Dover, R. Porter & Son rev. ed. 1829) ..........................................................................53

Act of Feb. 27, 1798, § 1, *reprinted in* 2 THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, 812, 812–13 (Boston, J.T. Buckingham 1807) ....................................................54

Act of Sept. 23, 1791, § 18, *reprinted in* AN ABRIDGMENT OF THE LAWS OF PENNSYLVANIA FROM THE YEAR 1700 TO APRIL at 2, 1811, 197, 197 (John Purdon, Jr. ed., Philadelphia, Farrand, Hopkins, Zantzinger & Co. 1811)..........53

KY. REV. STAT., ch. 91, art. II, § 11 (1851), *reprinted in* 2 THE REVISED STATUTES OF KENTUCKY, APPROVED AND ADOPTED BY THE GENERAL ASSEMBLY, 1851 AND 1852, 346, 349 (Richard H. Stanton ed., Cincinnati, Robert Clarke & Co. 1867) ....................................................................................................54

**Other Authorities**

Con Reynolds, *The Judicial Role in Federal Imprisonment*, 175 U. PA. L. REV. (forthcoming 2027), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6734518..........................57

Laura Weingart, *Judicial Remedies of Last Resort: Receiverships in the Prison Litigation Context*, 9 CARDOZO PUB. L. POL'Y & ETHICS J. 193, 211 (2010)......49

Wynne Muscatine Graham, *The Forgotten History of Prison Law: Judicial Oversight of Detention Facilities in the Nation's Early Years*, 138 HARV. L. REV. 1715 (2025) ...........................................................................................57

**Rules**

Fed. R. Civ. P. 25 ............................................................................................25

## INTRODUCTION

This litigation has persisted because of extraordinary and long-running constitutional violations in Arizona's prisons—life-endangering conditions that the Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") has long committed, yet failed, to remediate. The parties have twice agreed on the terms necessary to meet the constitutional standard, stipulating first to a settlement before trial and then to an Injunction after a three-week trial. Each time, ADCRR failed to comply, subjecting people in its prisons to shocking medical and mental health neglect. During the 14-year history of this case, ADCRR has not reached "even a semblance of compliance" with its obligation to provide minimally adequate healthcare to people in its prisons. 1-ER-18. This appeal is, at core, a request to further stave off remedies that ADCRR pledged to implement years ago.

The district court tried every measure to guide ADCRR toward constitutional compliance—holding ADCRR in contempt twice, imposing fines of more than two million dollars, vacating a settlement for noncompliance, conducting a three-week trial, appointing a physician expert chosen by ADCRR to monitor compliance with the Injunction, and issuing numerous enforcement orders. As the court later found, these measures "not only failed completely, but, if continued, would be nothing short of judicial indulgence of deeply entrenched unconstitutional conduct." *Id*. And so the court, in its discretion, resorted to the potent but plainly permissible option of a

receiver to facilitate ADCRR's implementation of its own commitments.

ADCRR asks this Court to reverse that discretionary, fact-bound determination. But district courts have significant discretion when faced with the "sensitive task of remedying unconstitutional prison conditions"; they must consider the range of options, including—as the Supreme Court has noted—the "appointment of … receivers." *Brown v. Plata*, 563 U.S. 493, 511, 538 (2011). And the course of proceedings below makes clear that the court engaged in protracted deliberations and careful consideration before resorting to what it recognized was the "extraordinary" and "harsh[]" step of appointing a receiver, 1-ER-18. The court's thorough, 83-page order justifying this remedy was supported by a voluminous evidentiary record and the vast procedural history of this long-running litigation.

ADCRR's sundry objections raise no serious dispute over any question of law. Rather, they distill down to complaints about how the court weighed the evidence. Because ADCRR fails to show the court abused its discretion, the appeal should be denied.

## ISSUES PRESENTED

1. Did the court abuse its discretion in appointing a receiver?

## STATEMENT OF THE CASE

### I. Complaint and 2014 Stipulation

Plaintiffs—a class of all people incarcerated in Arizona's state-operated

prisons, and Arizona Center for Disability Law, the state protection and advocacy agency—filed this suit in 2012, alleging the healthcare provided by ADCRR violated the Constitution. 5-SER-1485–6-SER-1563.[1] Ultimately, the parties agreed to a settlement ("the Stipulation"), designed to remedy those constitutional violations, 7-ER-1378–445, which the district court approved in 2015, 7-ER-1366–77. "[A]lmost immediately," the court later found, ADCRR "failed to perform [its] obligations [under the Stipulation] and continued in that failure." 6-ER-1101.

Between 2015 and 2021, the court engaged in exhaustive efforts in an attempt to obtain ADCRR's compliance with the Stipulation and the Constitution. The court held numerous evidentiary hearings and status conferences, resolved twelve motions to enforce against ADCRR, appointed two investigative experts, and issued "dozens of Orders" designed to spur remedial action. 1-ER-19. In 2018, the court held ADCRR in contempt and ordered it to pay almost $1.5 million in fines. 5-SER-1413–36. Three years later, the court again held ADCRR in contempt and issued sanctions of $1.1 million. 5-SER-1392.

Despite these exhaustive efforts, the Stipulation remained far from implemented, and people incarcerated in Arizona's prisons continued to suffer serious harm, up to and including death. During those years, ADCRR "litigate[d]

---

[1] The Arizona Center for Disability Law is now Disability Rights Arizona.

each and every issue to the maximum extent possible," filing "repetitive motions, close-to-baseless appeals, and petitions for writs of certiorari." 5-SER-1390. Certiorari was never granted, and on appeal, ADCRR prevailed on only a few minor issues. *Id.*; *see Parsons v. Ryan ("Parsons I")*, 754 F.3d 657, 690 (9th Cir. 2014) (affirming class certification); *Parsons v. Ryan ("Parsons II")*, 912 F.3d 486, 494–95 (9th Cir. 2018), *cert. denied sub nom*. *Ryan v. Jensen*, 140 S.Ct. 142 (2019) (three consolidated appeals, including affirming order that ADCRR use all available community healthcare services to ensure compliance with the settlement agreement); and *Parsons v. Ryan ("Parsons III")*, 949 F.3d 443, 451, 454–59 (9th Cir. 2020), *cert. denied sub nom. Shinn v. Jensen*, 141 S.Ct. 1054 (2021) (four consolidated appeals of eleven district court orders, affirming civil contempt sanctions against ADCRR).[2]

## II. Trial and Permanent Injunction

In early 2020, the court issued another order to show cause, threatening a third round of contempt. 5-SER-1412. In July 2021, the court determined that contempt or other efforts to enforce the Stipulation would be fruitless because ADCRR had "deflected their failures and employed scorched-earth tactics to oppose every

---

[2] Besides the published Ninth Circuit opinions pertaining to 15 district court orders, ADCRR filed and subsequently withdrew at least four other appeals of multiple court orders during that time. *See, e.g.*, Ninth Circuit Apps. 19-17072, 20-17021, 21-15589, 21-16397.

attempt to resolve outstanding noncompliance" and "[t]here does not appear to be a contempt sanction robust enough to coerce compliance." 5-SER-1383. The court found it had "repeatedly used the remedies authorized by the Stipulation and often exercised forbearance rather than imposing sanctions," but the "remedies and tolerance" had "proven ineffective." 5-SER-1351. The court rescinded the Stipulation and set the case for trial. 5-SER-1386–87.

The court's 200-page order following a 15-day bench trial found that ADCRR "failed to provide, and continue[s] to refuse to provide, a constitutionally adequate medical care and mental health care system for all prisoners" and its "years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference." 6-ER-1165. The court ordered that it would "employ an expert to assist with crafting an injunction that remedies the constitutional violations—no more and no less." 6-ER-1342.

The court appointed a physician "strongly recommended" by ADCRR for his expertise and familiarity with the case, as well as additional experts, including a psychologist. 1-ER-20; 3-SER-748–53, 755–56. The court shared a draft injunction with the parties in early 2023. Neither party objected. Instead, they jointly stipulated to the draft, with a few agreed-upon modifications. 6-ER-1099–100; 3-SER-727–28. In April 2023, the court issued the stipulated Permanent Injunction ("the Injunction"). 6-ER-1097–163. Neither party appealed.

In issuing the Injunction, the court observed that it "has no interest in micromanaging Defendants' operations," but it "cannot impose an injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible." 6-ER-1100–01, n.2. The court appointed "its own experts to serve as neutral monitors to evaluate Defendants' performance." 6-ER-1102.

## III. Post-Injunction Compliance Efforts

Monitoring began immediately. Later that year, the parties jointly asked the court to direct its experts to provide written reports, agreeing that "[t]he experts' opinions are critical because they are independent, neutral, and are based on expertise that the parties themselves lack." 3-SER-701–02. The experts filed reports in February 2024, October 2024, and January 2025, documenting ADCRR's failure to make meaningful progress implementing the Injunction and the unabated risk of harm to Plaintiffs. 2-SER-589–3-SER-644; 2-SER-395–410; 1-SER-287–2-SER-384.

### A. First Interim Report (February 2024)

In the February 2024 report, the experts found that "the quality of care provided by [ADCRR's private healthcare vendor] NaphCare remains woefully inadequate," and warned: "Patients are in daily danger." 3-SER-620. They found "pervasive dangers in the delivery of [mental health] care," "significantly deficient"

clinical documentation, and "inadequate conceptualization of the patients' mental illness, functional impairment, and suicide risk." 2-SER-598. Critically, they found that ADCRR was unable to identify problems, and documented numerous examples of "dangerous care being judged as adequate as part of self-assessments." 3-SER-611; *see, e.g.*, 2-SER-599–3-SER-605, 3-SER-613–19.

ADCRR dismissed the experts' findings as "difference[s] of opinion," deflected blame to its contract vendor, and complained: "What is distinctly absent from the Interim Report is a 'how-to guide,' much less a comprehensive plan, on how to achieve compliance with the Injunction." 2-SER-574–88.

### B. Special Report on Five Suicides (October 2024)

In October 2024, the court's mental health expert filed a report on five recent suicides. 2-SER-395–410. He found that "adherence to the [Injunction] would have decreased the probability of, if not prevented, these deaths." 2-SER-395. He highlighted three main areas of deficiencies: inadequate evaluation of mental health needs, inadequate treatment encounters, and lack of continuity of care. 2-SER-395–401. He observed that none of the areas are "unique to the cases under review" and that "these same deficiencies have contributed to, and continue to contribute to, risk of, and actual morbidity and mortality since monitoring began in April of 2023." 2-SER-395, 398, 400–01.

### C. Second Interim Report (January 2025)

In January 2025, the experts filed another report, finding that ADCRR's healthcare "remains poor, has shown little improvement since the start of the Injunction, and continues to place the residents at significant risk of serious harm, including death." 1-SER-288. The experts detailed preventable deaths that occurred from the broken healthcare system, found that "little progress has been made in the vast majority of key operations," and came to a grim and unflinching conclusion: "And patients are dying. Unnecessarily." 1-SER-288, 293–94, 297; 2-SER-307, 319–56.

The experts again found that ADCRR was unable or unwilling to monitor compliance accurately, even when the experts "informed [them] of [a] methodological flaw" leading to biased results. 1-SER-289–90. When ADCRR officials were made aware of a serious error, they "made no plan to understand how this error occurred" and "failed to implement any recommendations or plan to prevent its recurrence." 1-SER-293.

### D. Staffing Pilot Project (July 2024 to January 2025)

The Injunction adopted a two-step remedy to address the court's finding that "staffing is woefully insufficient." 6-ER-1190. First, the Injunction mandated that ADCRR "fill all positions required by the current contract," plus a limited number of additional positions, within three months. *See* 6-ER-1099, 1109, 1135. Second,

the Injunction noted these "immediate hires may ultimately be insufficient," and ordered a comprehensive staffing plan be conducted by experts. 6-ER-1099; 6-ER-1110. The court expected a completed plan by approximately October 2023. 2-SER-437.[3]

Progress was much slower. In July 2023, the court experts found "staffing remains markedly inadequate to meet the immediate requirements" of the Injunction. 3-SER-725. By February 2024, ADCRR still had not met the minimal staffing requirements it had promised to meet by July 2023. In their February 2024 report, the experts observed: "On the day the Injunction went into effect, April 7, 2023, NaphCare's staffing level was well below the minimal level required by the Court, i.e., dangerously low, and now, some eight months later, it remains so." 2-SER-604; *see also* 2-SER-473 (ADCRR's report that "as of the February 2024 monthly staffing report . . . NaphCare had filled only 935.70 positions"). The experts also found ADCRR had not taken necessary steps to fill existing staffing vacancies and had reported inflated salary data to the court. 3-SER-607.

Between August 2023 and June 2024, the court issued a series of orders and held status conferences "focused on identifying methods to compel recruitment of

---

[3] This Court recently reviewed and recounted the history of the healthcare staffing orders in this case. *See Jensen v. Thornell*, No. 25-4365, 2026 WL 2043607, at *1–2 (9th Cir. June 5, 2026).

healthcare staff," in an "attempt to spur compliance with the Permanent Injunction." 2-SER-445–46; *see also* 3-SER-714–19, 720–24; 2-SER-436–44, 490–93, 571–73; 5-ER-1088–92. In those proceedings, ADCRR acknowledged the excessive time it was taking to fill vacancies, but deflected blame to the legislature, claiming that because of the appropriations process, ADCRR could not increase salaries for at least another 16 months. 2-SER-538–40. ADCRR also complained that NaphCare had failed to increase salaries, despite ADCRR providing it money to do so, and requested that the court order NaphCare (a nonparty) to increase salaries. 2-SER-539, 553–54. The court explained "it had no desire to become enmeshed in contractual matters between Defendants and NaphCare," and emphasized that ADCRR should enforce its contract. 2-SER-491; 5-ER-1091.

While ADCRR struggled to fill the minimal initial increases mandated by the Injunction, the experts began to create a staffing plan. *See* 2-SER-438. In April 2024, the court's experts filed their plan and recommended it be tested on a pilot basis. 5-ER-1086–87. ADCRR objected strenuously to the plan and demanded the experts testify at a hearing regarding their methodology. 2-SER-475–89; *see also* 2-SER-443 (court observing ADCRR's objections "reflected . . . continued resistance to meaningful efforts to increase staffing" and that it was "difficult to view their behavior as anything other than attempts to delay issuance of a statewide staffing plan"). Ultimately, ADCRR's "questioning of the experts" only "bolstered the

experts' credibility and their staffing plan." 2-SER-440. In June 2024, the court ordered the plan be implemented on a pilot basis at two sites chosen by ADCRR, 2-SER-436–44, 496, 530; pursuant to a schedule developed by the experts and ADCRR, with specific modifications agreed to by the parties, 2-SER-428–35.

The pilot was a disaster. It ran for 28 weeks between July 2024 and January 2025. 5-ER-1058. In a series of three reports, the experts documented myriad ways in which ADCRR and its vendor failed to implement the pilot. 2-SER-385–94, 411–27; 5-ER-1056–75. At one site, "[t]he pilot operated for just eight days" because of insufficient space—even though ADCRR had selected this pilot site and had been on notice of the inadequacy of space at the site since at least July 2024. 5-ER-1059, 1068; 1-SER-220, 222, 224, 226; 5-ER-1087. Throughout the pilot, ADCRR also violated the court's express orders related to pilot staffing. *See* 5-ER-1035–36 (citing 5-ER-1057–62).

Ultimately, of the court-ordered pilot requirements, the experts found only 22% were completed, 14% were partially completed, and 63% were not completed. 5-ER-1061. They concluded: "ADCRR lacks the human resources, the space and the administrative and professional project management capacity to successfully implement the [staffing plan] statewide or at any individual prison." 5-ER-1071. They also found that "ADCRR does not have a plan to implement the staffing plan beyond the end of the Pilot," although the plan would "be finalized shortly with

relatively minor revisions," and "the Court required it to be implemented immediately upon completion of the Pilot." *Id.*

The experts finalized the plan in March 2025, and the court ordered its implementation in June 2025. 1-SER-200; *see also* 5-ER-887. That plan was nearly identical to the plan created in April 2024, 1-SER-123, and required ADCRR to hire approximately 600 additional FTE healthcare professionals, *see* 1-SER-203. As of February 2026, ADCRR had added only ***three*** FTEs. *See* 1-SER-31, 38, 61. (excerpts of ADCRR's Monthly Staffing Reports).

## IV. Motion for Receiver

In early 2025, Plaintiffs filed a motion requesting appointment of a receiver to oversee healthcare in Arizona's prisons, citing ADCRR's failure to make meaningful progress implementing the Injunction and the disastrous staffing pilot. 5-ER-1022–55. The parties agreed that no discovery or evidentiary hearing was necessary. 1-SER-215. After briefing was complete, the court ordered its experts to complete "a comprehensive Report addressing material issues concerning the Motion for a Receiver," and ordered the parties to respond. 1-SER-212–13.

### A. Third Interim Report (July 2025)

In July 2025, the court experts filed a 306-page report cataloging "ADCRR's profound lack of compliance with the vast majority of individual elements of the Injunction two years after its implementation," "the daily risk to which patients are

subjected," and "the lack of improvement since monitoring began." 4-ER-616. They again found "multiple fundamental system level failings in ADCRR's health care operation," causing avoidable suffering and death. 4-ER-581, 589, 603, 646. The experts concluded: "The system changes required by the Injunction to protect human life and limb and prevent suffering are still broken, and ADCRR is still struggling to identify and prioritize the changes it needs to make, let alone actually make those changes." 4-ER-582.

The largest section of the report assessed ADCRR's compliance with each healthcare requirement of the Injunction. 4-ER-621–5-ER-884. The experts found ADCRR "remains noncompliant with the vast majority, with slow (or little) progress toward achieving substantial compliance." 4-ER-578. Specifically, they determined ADCRR was noncompliant with 131 of 154—85%—of the requirements. *See* 4-ER-616; 1-ER-44. Significantly, they found that ADCRR's noncompliance was in areas "where non-compliance pose[d] the highest risk" to incarcerated persons. 4-ER-615-16. They further found "Defendants' own data shows their overall lack of improvement" and "does not reflect any significant improvement over time." 4-ER-616. And they found serious methodological problems with many of ADCRR's self-reported compliance scores, *see* 4-ER-637, 655, 664, 724–25, 729–31, 745, 757, 789–90, including that ADCRR had relied on invalid, and possibly falsified, documentation and data, *see* 4-ER-672, 682, 696, 722–23.

The experts also reviewed recent deaths, uncovering a panoply of serious, often compounding, errors, including "dangerous" infirmary admission orders, significant delays in specialty care (*e.g.*, scheduling an urgent cardiology appointment for two months out, "by which date the patient had been dead for almost a month"), ignoring or failing to respond with urgency to obviously serious medical symptoms (such as severe and sudden stomach pain or high blood pressure), preventable suicides, and "evidence of falsification of records." 4-ER-582–89, 591–98. ADCRR regularly failed to identify, much less solve, these systemic errors through their mortality review process. 4-ER-581–89.

The parties responded to the experts' report in August 2025, 3-ER-289–323; 1-SER-99–121; and the court held a hearing on Plaintiffs' motion in September 2025, 1-SER-96–98. After the hearing, the parties filed supplemental briefs, 1-SER-79–95; the experts responded to the parties' written submissions, 2-ER-208–24; and the court permitted the parties to respond to the experts' responses, 1-SER-78; 2-ER-192–203.

### B. Appointment of Receiver

In February 2026, the court issued an 83-page order granting Plaintiffs' motion, 1-ER-17–144, concluding:

> To declare a government will not accept the constitutional responsibility to provide adequate healthcare is huge. Ordering the implementation of a receivership is extraordinary, and the Court has exercised caution and critical reflection in making the decision. But since the beginning of the case, the

> Court has forborne imposing the harshest penalties, opting instead to guide Defendants with the help of the Monitors towards comprehensive constitutional compliance. But now after nearly 14 years of litigation with Defendants having not gained compliance, or even a semblance of compliance with the Injunction and the Constitution, this approach has not only failed completely, but, if continued, would be nothing short of judicial indulgence of deeply entrenched unconstitutional conduct. Plainly, only the imposition of the extraordinary can bring an end to this litigation and the reasons it was brought. An end to unconstitutional preventable suicides. An end to unconstitutional preventable deaths. An end to unconstitutional failures to treat those in severe pain.

1-ER-18.

The court requested nominations and briefing from the parties on the scope of the receiver's authority. 1-ER-98–99. ADCRR nominated Annette Chambers-Smith, the former Director of the Ohio Department of Rehabilitation and Corrections. 1-SER-12–22. On July 17, the court appointed Ms. Chambers-Smith and issued an order delineating her authority. 1-ER-2–16.

The order grants Ms. Chambers-Smith leadership and management authority over ADCRR's healthcare system, but requires her to "work closely with Defendants" and comply with all state laws and regulations, absent an express waiver from the district court. 1-ER-12–14. The order requires the receiver to consult with ADCRR, the Governor, and the Legislature regarding budgetary matters. 1-ER-5. Finally, the order clarifies that "[t]he Receiver's authority, actions, and decisions shall be subject to review of the Court." 1-ER-6.

ADCRR appealed the receivership and appointment orders. *See* Nos. 26-1746,

26-5060. ADCRR sought a stay of these orders from three courts. Plaintiffs opposed, and the district court, this Court, and the Supreme Court each denied the stay request. *See* 2-ER-149; Dkt. 27.1 at 1–2; *Thornell v. Jensen*, No. 26A370, 2026 WL 2975650 (U.S. Oct. 1, 2026) (Kagan, J.). The district court ordered the receivership to begin on October 19, 2026. 1-SER-3–5. On October 7, ADCRR filed a motion for reconsideration of this Court's order denying the stay. *See* Dkt. 36.1. Plaintiffs opposed, Dkt. 39.1; the motion is pending.

## SUMMARY OF THE ARGUMENT

**I.** District courts have significant discretion in employing a remedy when faced with the "sensitive task of remedying unconstitutional prison conditions" and must consider a range of options, including the appointment of receivers. *Brown v. Plata*, 563 U.S. at 511, 538. There is overwhelming evidence that the court did not abuse its discretion in appointing a receiver.

**A.** ADCRR's principle argument is that the court legally erred by considering the entire 14-year record of noncompliance in this case. ADCRR insists the court should have ignored everything but the last three years. That position is not supported by the law, which makes plain that the efficacy of a court's prior efforts are relevant to whether additional remedies are needed. And, despite ADCRR's insistence to the contrary, its intransigence and noncompliance with the Stipulation has an "obvious through-line" with its failures to comply with the Injunction. In

short, the Injunction did not restart the compliance clock.

**B.** Even if ADCRR were correct (it is not), the court considered that argument and determined that ADCRR made insufficient progress in the last three years to warrant another remedy. ADCRR argues that the court should have engaged in another round of contempt proceedings, but there is nothing in the record showing that ADCRR's calculus of paying millions of dollars in contempt fines instead of complying with court orders had changed. ADCRR also makes much of the fact that the court appointed a receiver three years after the Injunction issued, while giving the receiver five years to achieve compliance. Those time periods are not inconsistent. The court found after three years that ADCRR had made very little progress implementing the Injunction. On the other hand, it recognized that, given how little progress had been made, it may take the receiver five years to bring ADCRR into compliance.

**C.** The court did not clearly err in weighing the evidence of ADCRR's purported progress—it credited ADCRR's actual improvements in certain areas and reasonably questioned the validity of ADCRR's assertions of progress in others. The court and the experts considered ADCRR's staffing data in detail and reasonably found the touted progress to be "woefully insufficient." The court also considered ADCRR's increased spending, but found, based on the evidence, that ADCRR remained unable to make the necessary changes despite a costly contract with

NaphCare. At bottom, the court did not err in rejecting ADCRR's narrative of "sustained progress"—especially in light of ADCRR's 85% *noncompliance* rating.

**D.** Assuming a clear and convincing evidence standard applies to the court's findings, the court's remaining findings were supported amply by a vast evidentiary record.

**i.** The record of harm before the court was immense, including evidence of patients dying after extreme delays in specialty and higher levels of care and receiving grossly incompetent treatment. ADCRR casts aside numerous accounts of serious harm as isolated incidents insufficient to support the court's conclusions. But the court did not err—it supported its conclusions with its extensive findings of fact following a bench trial in 2022 and the well-supported opinions of the experts.

**ii.** The court's bad faith analysis was similarly supported by ADCRR's displays of recalcitrance and belated rejection of the Injunction it helped draft and agreed to; its unilateral abandonment of the staffing pilot; its overstatement of its progress; and its reporting of inaccurate data.

**iii.** The court's finding that ADCRR lacks necessary leadership to turn the tide was also well-supported by ADCRR's grim performance related to the staffing pilot; demonstrated tendency to deflect responsibility; and need for constant micromanagement.

**E.** ADCRR plainly forfeited its belated argument that receivership is not

an available remedy here—based on the Prison Litigation Reform Act ("PLRA") and *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). There are no exceptional circumstances excusing ADCRR's failure to raise these arguments in the district court. And Plaintiffs would be prejudiced if the Court considers the forfeited argument on expedited appeal because they did not have the opportunity to develop the facts necessary to rebut the argument.

**II.** ADCRR's concerns regarding the scope of the receiver's authority are speculative and overstated. The court's order delineating the receiver's powers does not intrude on the State's authority unnecessarily.

**A.** The receiver cannot bypass state law without another court order—instead, she is directed to "endeavor to perform all responsibilities and duties in accordance with Arizona state laws, regulations, and contracts."

**B.** The receiver is likewise not permitted to commandeer Arizona's appropriations process. In recognizing the State's budgetary prerogatives, the court set up a process requiring notification and extensive consultation with state officials before the court would even consider a motion for more funds.

## STANDARD OF REVIEW

In determining whether to appoint a receiver, courts weigh: (1) whether there is a grave and immediate threat or actuality of harm; (2) whether the use of less extreme measures of remediation have been exhausted or would prove futile; (3)

whether continued insistence on compliance with the court's orders would lead only to confrontation and delay; (4) whether there is a lack of leadership to turn the tide within a reasonable period of time; (5) whether there is bad faith or repeated failure to implement changes; (6) whether resources are being wasted; and (7) whether a receiver is likely to provide a relatively quick and efficient remedy. *See United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 637 (5th Cir. 2025); *Plata v. Schwarzenegger*, No. C01-1351, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005).[4]

The Ninth Circuit "review[s] a district court order appointing a receiver" for an "abuse of discretion." *Can. Life Assurance Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009). Under that standard, this Court "will reverse only if the district court made an error of law, or reached a result that was illogical, implausible, or without support in the record." *Parsons II*, 912 F.3d at 495. "Further, where the enjoined party has a history of noncompliance with prior orders, and particularly where the trial judge has years of experience with the case at hand, [this Court] give[s] the

---

[4] The parties below agreed on this test, *see* 5-ER-898; 5-ER-1037–38, and the district court applied it, 1-ER-39. Accordingly, nonparty Amici's belated—and perfunctory—suggestion that that the court's application of the test is itself "subject to challenge," falls flat. Amici Br. at 6 n.2; *see*, *e.g.*, *United States v. Sineng-Smith*, 590 U.S. 371, 375–80 (2020) (concluding Ninth Circuit abused its discretion and violated the party presentation rule by appointing amici to brief issues not raised by the parties and then invalidating a statute based on those amici-briefed issues).

court a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation." *Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1221 (9th Cir. 2018) (citation modified); *see also Hutto v. Finney*, 437 U.S. 678, 688 (1978) ("[T]he exercise of discretion in this [prison reform] case is entitled to special deference because of the trial judge's years of experience with the problem at hand.").

A court's determination that a given measure of prospective relief is the least intrusive means of achieving the remedy under the PLRA is a factual determination reviewable for clear error. *See Armstrong v. Newsom*, 58 F.4th 1283, 1293 (9th Cir. 2023) (stating needs-narrowness-intrusiveness findings are reviewed for clear error); *Brown v. Plata*, 563 U.S. at 517, 529 (applying clear error standard to court's determination that, absent a population reduction, continued efforts by receiver and special master would not achieve a remedy).

## ARGUMENT

ADCRR's challenge to the district court's orders boils down to whether the factual circumstances justified the remedy. Here, the court most familiar with the lengthy and voluminous factual record determined that they did. The court's order appointing a receiver was comprehensive, meticulously detailed, and supported by the well-researched and thorough opinions of the neutral court experts. And its order delineating the receiver's powers was targeted and careful to impose limited

intrusions on the State's authority. The court neither abused its discretion nor clearly erred with regard to either order.

## I. The District Court Did Not Abuse Its Discretion by Appointing a Receiver.

### A. ADCRR's Fourteen-Year History of Intransigence Obviously Bears on the Question of Whether a Receiver Is Necessary.

ADCRR's attempt to twist the court's inextricably fact-bound determination into a series of pure legal questions is not only unavailing, but it rests precariously atop a false premise: that the court was limited to considering ADCRR's conduct following the approval of the Injunction in 2023. *See* AOB at 25 (casting this as the "overarching error" that "reaches all four inquiries"). That premise is wrong.

Throughout this decade-and-a-half-long litigation, "rather than imposing the most punitive sanctions" the court "painstakingly sought to and imposed the least restrictive measures and requirements on Defendants to incentivize compliance with the Constitution." 1-ER-70. In brief, those efforts included: twelve motions to enforce the parties' 2014 Stipulation by Plaintiffs that resulted in dozens of additional orders to enforce the Stipulation; three orders to show cause why ADCRR should not be held in contempt; appointment of Rule 706 experts; two findings of contempt resulting in millions of dollars in sanctions; rescission of the parties' Stipulation based on ADCRR's persistent noncompliance; a 15-day bench trial; and the appointment of experts to aid in crafting the Injunction, which "offer[ed]

Defendants a hoped-for final opportunity to remedy their constitutional violations." 1-ER-17–20, 70–72; *see also* 6-ER-1165, 1167–68.

ADCRR does not dispute the court's determination that during those years it offered "erroneous and unreliable excuses for non-performance, asserted baseless legal arguments, and in essence resisted complying with the obligations [it] contractually knowingly and voluntarily assumed." 5-SER-1351; *see also* 6-ER-1101 ("Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage."). Nor does ADCRR dispute that the court, for years, "repeatedly used the remedies authorized by the Stipulation and often exercised forbearance rather than imposing sanctions" and that those "remedies and tolerance" were ultimately "ineffective" in changing ADCRR's conduct. 5-SER-1351.

Instead, ADCRR brushes over its years of intransigence and insists that the court *erred as a matter of law* in considering this history. *See*, *e.g.*, AOB at 25, 35–37. This attempt to sweep under the rug ADCRR's "long and regrettable history of delays, noncompliance, and contempt," *Jensen v. Thornell*, 2026 WL 2043607, at *2, is not supported by the law. ADCRR cites no authority requiring a federal court, in exercising its equitable authority over compliance with its orders, to ignore the full litigation record that produced those orders. Nor could it.

Under settled caselaw (and common sense), the efficacy of a court's prior

efforts is plainly relevant to whether additional remedies are needed. *See Brown v. Plata*, 563 U.S. at 516 ("When a court attempts to remedy an entrenched constitutional violation through reform of a . . . statewide prison system, it may be necessary . . . to issue multiple orders directing and adjusting ongoing remedial efforts. Each new order must be given a reasonable time to succeed, but reasonableness must be assessed in light of the entire history of the court's remedial efforts."); *Hutto*, 437 U.S. at 687 ("[T]aking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance."); *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016) (reversing vacatur of consent decree governing prison's operations where trial court failed to consider "the defendants' record of compliance—either with the 2011 Decree or its predecessor—'which over the course of the litigation has been far from exemplary'").

Put simply, ADCRR acts as if this case started with the Injunction. But that blinks reality. Both the Injunction and the Stipulation were crafted to address the same constitutional violations. *See* 5-SER-1374 (court's observation in 2021 that ADCRR's noncompliance with the Stipulation "involve[s] some of the most fundamental and critical aspects of health care that formed the basis of this lawsuit in 2012, of which Defendants are very aware"). As the district court explained, the Injunction "is not a 'dramatic' alteration of Defendants' obligations. Rather, it is a

comprehensive elucidation of what has always been required of the Defendants. And the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation." 1-ER-72; *see also Parsons II*, 912 F.3d at 493 (describing the Stipulation as "obligat[ing] Defendants to adopt certain standards and practices across a wide spectrum of health care categories, including diagnostic services, preventative services, mental health, and access to care"). Even a cursory comparison makes clear that the two remedies were designed to solve the same problems.[5]

ADCRR next insists the court was required to ignore its prior conduct because "the relevant conduct is that of the 'new leadership,' not its predecessors." AOB at 37. But governmental entities cannot restart the clock every time a new official takes

---

[5] *E.g.*, *compare* 5-ER-873 (finding ADCRR noncompliant with the Injunction's requirement that "[t]he Problem List in a patient's health record shall be accurate, complete, and easily usable"), *with* 7-ER-1406 (requirement in Stipulation that "[e]ach patient's medical record will include an up-to-date Master Problem list"); *compare* 4-ER-818 (finding ADCRR noncompliant with the Injunction's requirement that "[p]atients in a crisis stabilization bed shall be evaluated at least daily") *with* 7-ER-1412 (Stipulation's requirement that "prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily"); *compare* 4-ER-645 (noncompliance with Injunction's requirement that specialty referrals be completed within the ordered timeframe) *with* 7-ER-1409 (Stipulation's requirements that specialty consults be completed within specific timeframes); *compare* 4-ER-639 (noncompliance with Injunction's requirement that diagnostic tests be completed within the timeframe ordered) *with* 7-ER-1409 (Stipulation's requirement that "[o]n-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine").

office. *See* Fed. R. Civ. P. 25(d); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). This suit is against ADCRR, which is responsible for implementing court orders and complying with the Constitution. Defendants-Appellants in this case are, in their official capacities, the Director of ADCRR and the Assistant Director of ADCRR's Medical Services Contract Monitoring Bureau. 6-ER-1166. Over the course of this litigation, there have been at least three ADCRR Directors, as well as four for-profit healthcare contractors. 5-ER-892, 906; 3-SER-732, 765, 771; 4-SER-976–77. It cannot be that any time there is a change in leadership, the clock restarts and the court must march through the same series of ineffective efforts before ordering more potent relief. That interpretation "would delay an eventual remedy and would prolong the courts' involvement, serving neither the State nor the prisoners." *Brown v. Plata*, 563 U.S. at 516.

Finally, ADCRR attempts to distinguish the Injunction on the basis that the court did not find it in violation of the Constitution until after the bench trial in 2022. AOB at 20, 36. But even if the Stipulation was untethered to constitutional violations (and it was not), ADCRR's failure to implement it and submission of frivolous arguments and misleading data to the court when faced with enforcement would surely still bear on the court's inquiry here. It is also wrong. The court, in 2015,

found the Stipulation the parties agreed to in 2014 was "necessary to correct" and "the least intrusive means necessary to correct the violations of the Federal right of the Plaintiffs." 5-SER-1442. That finding "necessarily require[d] a finding of a constitutional violation—that is, if there were no violation of a federal right, there would be nothing for the Stipulation to 'correct.'" *Parsons II*, 912 F.3d at 501. ADCRR's failure to comply with the constitutional minimums in the Stipulation has an "obvious through-line" with their failure to comply with the constitutional minimums in the Injunction. *United States v. Hinds Cnty.*, No. 3:16-cv-489, 2022 WL 17408643, at *3–4 (S.D. Miss. Dec. 2, 2022) (rejecting argument that stay was warranted on order finding receiver appointment four months after vacating previous consent decree and without new contempt-purge cycle appropriate, as there was "an obvious through-line between the County's failure to comply with the constitutional minimums in the Consent Decree and its failure to comply with the constitutional minimums in the New Injunction"), *aff'd in relevant part Hinds Cnty.*, 128 F.4th 616.

### B. The District Court Did Not Err in Finding ADCRR Had Sufficient Opportunity to Demonstrate It Would Comply With the Injunction.

Even adopting ADCRR's preferred post-2023 time period, its argument lacks merit. The court did not confine its analysis to pre-2023 enforcement efforts; it acknowledged "that alone, a historical failure to fully comply may not warrant the

extraordinary remedy of a receivership," 1-ER-97, and provided a detailed, 15-page account of ADCRR's failure to implement the Injunction, despite exhaustive efforts of the court and its experts. 1-ER-22–37, 72–74. The court concluded that "since entry of the Injunction, Defendants' paltry efforts to remedy the constitutional violations in the provision of healthcare have been in substantial conformity with their behavior throughout the litigation" and that "[t]o date, and despite the repeated offers of assistance and advice from the Monitors, Defendants offer no concrete plan to achieve compliance other than to limp along with their continuing failure to comply with the Injunction." 1-ER-72, 74.

The court's efforts to spur compliance with the Injunction included: requiring ADCRR to monitor all elements of the Injunction on a monthly basis and make their findings available to the experts and Plaintiffs; holding multiple status conferences and hearings to address ADCRR's noncompliance; directing the experts' dedication of "hundreds of hours evaluating Defendants' performance and engaging with Defendants to assist them with compliance"; ordering the experts to complete six reports on ADCRR's performance; issuing an order finding that ADCRR was in violation of the Injunction; issuing multiple orders setting out ADCRR's failure to address inadequate staffing; ordering ADCRR to implement the Pilot Project proposed by the experts; and ordering ADCRR to implement the statewide staffing

plan. 1-ER-21–37.[6] Far from doing nothing before imposing a receivership, the court went to great lengths to ensure ADCRR was aware of what was required under the Injunction and that it had the tools necessary to comply. Simply put, ADCRR's claim that the court "leapt from monitoring to receivership," AOB at 20, and "imposed no intermediate remedy of any kind," *id.* at 33, "is both inaccurate and unavailing," 2-ER-147.[7]

ADCRR makes much of the fact that the court did not find it in contempt for noncompliance *with the Injunction* before appointing a receiver. AOB at 33–35. But courts have appointed receivers over prison systems without prior contempt findings. *See Plata*, 2005 WL 2932253, at *27 (collecting cases); *Newman v. Alabama,* 466 F. Supp. 628, 635 (M.D. Ala. 1979) (finding contempt proceedings "promise only confrontation and delay" due to defendants' noncompliance); *Wayne*

---

[6] ADCRR strings together a scattering of quotes from these proceedings to protest that "Defendants never really received" an opportunity to implement the Injunction. AOB at 31–32. This veiled assertion of bias is belied by any fair reading of the record.

[7] ADCRR dismisses this history, stating these measures were "a component of or flowed from the Injunction's own monitoring-and-planning machinery." AOB at 34. That contention cannot be squared with ADCRR's repeated assertion that the necessity of the receivership "must be measured against that operative decree and the administration implementing it." *Id.* at 19. It is also contrary to the position ADCRR took on an appeal of one of these orders earlier this year. *See Jensen v. Thornell*, No. 25-4365, Dkt. 21.1 at 14 (9th Cir.) (arguing order requiring implementation of staffing plan "orders new prospective relief" and "does not merely enforce relief that the Injunction already granted").

*Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Off.*, 444 N.W.2d 634, 660 (Mich. Ct. App. 1989) (reasoning that bringing "[t]housands" of noncompliant jail operations into compliance through a cycle of contempt proceedings "would be inefficient and seemingly endless" and "would never bring full implementation of its orders").

Moreover, the court tried contempt—*twice*—to no avail. 5-SER-1357, 1361, 1367, 1383. "The first sanction was $1.445 million and the second was $1.10 million. Neither sanction coerced or even motivated complete compliance." 5-SER-1367. The court reasonably concluded that further rounds of contempt sanctions would be ineffective. *See, e.g.*, 3-SER-766 ("Imposition of substantial fines, and threats of even more, did not prompt Defendants to make required efforts to perform as they agreed under the Stipulation."); 5-SER-1383 ("There does not appear to be a contempt sanction robust enough to coerce compliance."). Indeed, contempt sanctions create little incentive for ADCRR to change because its healthcare vendor (NaphCare) largely indemnifies ADCRR. *See* 5-SER-1383 n.14 (noting that "Defendants are indemnified from having to pay any fines themselves"); 3-SER-689–90 (amendment to indemnification agreement). Fines also do not motivate NaphCare to change course—the CEO stated under oath that sanctions "have not in any way incentivized or influenced NaphCare's performance or compliance." 2-SER-471.

ADCRR's suggestion that a *third* contempt finding might have finally

spurred it to correct course lacks support in the record. ADCRR repeatedly chose to incur millions of dollars in contempt fines—and millions more in litigation expenses—rather than comply with the court's orders, and nothing in the record suggests that calculus has changed. The law does not require the court to engage in the same failed, futile steps. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced.").[8]

ADCRR next argues that appointing a receiver three years after issuing the Injunction was legal error because the court estimated that a receiver would need at least five years to cure the constitutional violations. AOB at 29–31. ADCRR's circular argument lacks merit: it conflates how long it will take a receiver, appointed to oversee a state agency with a demonstrated record of recalcitrance to obey court orders, to remedy the constitutional violations that have plagued the Arizona prison system for years, with how long the court needed to evaluate whether ADCRR could remedy these problems on its own. Recognizing that 15% compliance over three years is unacceptable—and not the path to success—hardly establishes that 100%

---

[8] *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) does not help ADCRR. The Court instructed that the district court should have "waited until the threat of sanctions failed to induce compliance" before imposing a more intrusive remedy, but reasoned this was necessary because "a previous threat of contempt sanctions induced compliance." *Id.* at 864–65. Not so here.

compliance must be achieved in that same time.

Other courts have appointed receivers within similar time frames, *see Wayne Cnty. Jail Inmates*, 444 N.W.2d at 638–42 (less than two years); *Plata*, 2005 WL 2932253, at *3, *19 (three years); *Hinds Cnty.*, 128 F.4th at 623–25 (less than three years), and ADCRR's attempts to distinguish these cases only amplifies Plaintiffs' position. AOB at 32–33. For example, ADCRR is correct that the *Wayne County* receiver was appointed after 18 years of litigation. *Id.* But the proceedings there mirror the proceedings here. In 1971, a three-judge panel found conditions in the jail unconstitutional. *Wayne Cnty. Jail Inmates*, 444 N.W.2d at 551. Thirteen years later, the parties consented to a new "final judgment." *Id.* at 551–52. Two years after that, the monitor found "improvements in some areas," but "substantial noncompliance in every category covered in the final judgment." *Id.* at 552. The court then appointed a receiver, citing "continuing noncompliance with the final judgment," as well as the entire history of noncompliance in the case. *Id.* at 553–54, 558–60; *see also United States v. Hinds Cnty.*, No. 3:16-cv-489, 2022 WL 3022385, at *2, 11 (S.D. Miss. July 29, 2022), *aff'd in relevant part by Hinds Cnty.*, 128 F.4th at 636–39 (appointing receiver over operations of county jail four months after modifying consent decree).

ADCRR has not shown that the court erred with respect to the wide latitude it gave them to comply with the Constitution before appointing a receiver.

### C. The District Court Did Not Abuse Its Discretion by Appointing a Receiver Despite ADCRR's Assertions of Recent Progress.

ADCRR next suggests that a receivership cannot, as a matter of law, be the least intrusive means if a party is "measurably improving conditions." AOB at 25. This, again, boils down to a disagreement with how the court weighed the evidence. *See id.* at 19, 27 (claiming that the court did not adequately weigh improvements because it "acknowledged the progress only glancingly"). But the evaluation and analysis of evidence is a factual determination, which can be reversed only for clear error. *See United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) ("A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous." (citation omitted)). Even ADCRR does not claim there was such error here.

The court afforded ADCRR ample opportunity to submit evidence, and incorporated the evidence ADCRR here says the court ignored. *See* 1-ER-38, 78–79, 81–82, 90, 112, 113 (Hepatitis-C and opioid use disorder treatment); 1-ER-38, 92 (expenditures); 1-ER-38, 46–47 (staffing increases); 1-ER-107 (facility improvements); 1-ER-77, 90 (PCCM). Ultimately, the court credited the neutral experts' finding that "taking into account the nature, number, and speed of improvements," ADCRR's progress "'does not change [the] core findings' that non-compliance with the Injunction persists and poses serious risks of harm to the prisoners." 1-ER-77–78.

The neutral experts found, more than two years after the issuance of the Injunction, that ADCRR was noncompliant with 85% of the healthcare requirements (131 out of 154), *see* 1-ER-44, 100-44, including those provisions at "the core of the Injunction," 1-ER-46, and those that "could have been implemented soon after the Injunction was issued," 1-ER-82–83. Contrary to ADCRR's complaints on appeal, this assessment does not mask progress: the experts found ADCRR was dramatically out of compliance with most requirements, "with slow (or little) progress toward achieving substantial compliance." 4-ER-578. ADCRR cites a handful of provisions where the experts found it to be "non-compliant," though the compliance percentage reported was over 75%. AOB at 40 n.3. But for the vast majority of requirements, ADCRR did not miss compliance by a few percentage points—the experts acknowledged "no non-heavenly system is perfect nor should the Court expect this of ADCRR," but found ADCRR was "light years" away from complying with the Injunction. 4-ER-618–19; *see also* 4-ER-618 (court experts detailing methodology and noting "we do not believe that perfection is achievable, nor is it the basis of our evaluations"; "[o]ur benchmark is *substantial* compliance") (emphasis in original). Even according to ADCRR's own data, it came nowhere close to complying with the Injunction during these three years. 4-ER-616. ADCRR cannot recast these findings as "substantial and sustained progress." AOB at 1.

ADCRR faults the court for failing to discuss "systemwide staffing increases."

AOB at 27. To start, ADCRR overstates its gains.[9] Moreover, the court and its experts considered ADCRR's staffing data in detail. *See* 1-ER-46–48 (court explaining why ADCRR's staffing data for physicians and medical directors was misleading); 1-ER-47, n.43 (court acknowledging the "numbers have changed slightly while the Motion has been pending"); 1-ER-605, 849–50 (experts' analysis of staffing data and conclusion that "ADCRR has increased staffing, however, the increase is woefully insufficient" and "NaphCare's efforts to increase salaries have been anemic, at best"). And ADCRR's attempt to wield these facts to demonstrate "sustained progress" is belied by the record and the order—both of which make plain that staffing increases ADCRR now touts came unacceptably slowly, and only after the court found ADCRR to be noncompliant with the preliminary staffing requirements in the Injunction and issued a series of orders and held hearings to identify "methods to compel recruitment of healthcare staff," in an "attempt to spur compliance with the Permanent Injunction." 2-SER-445; *see also* Statement of the

---

[9] Specifically, ADCRR compares its overall staffing numbers as of July 2025, *see* 3-ER-293, to staffing levels in 2021, *see* 6-ER-1173. But the 2021 data excluded temporary/registry staff and regional staff. *See* 6-ER-1173. ADCRR's July 2025 data includes both. *See* 3-ER-330 (including 82.8 regional staff and 31.5 registry staff in calculation of total FTEs). ADCRR's data also includes physicians without board certification, *see* 1-ER-47, though the Injunction requires all physicians be board-certified, 6-ER-1121, and the court denied ADCRR's request to modify this provision, *see* 1-SER-6–9 (denying the request because "Defendants have not made good faith efforts to comply" and "have never credibly established they are unable to attract fully qualified applicants").

Case § III, *supra*.[10] Those efforts culminated in the staffing pilot – which was a disaster – and the statewide staffing plan – which ADCRR has failed to implement.[11] The court did not err in rejecting ADCRR's narrative of progress. *See* 1-ER-47–48 (discussing this history and concluding "[f]or Defendants to now suggest they be absolved of their staffing violations and even exalted with praise because today only 100 contract positions remain unfilled is preposterous").

ADCRR next insists that the court "recharacterized" its increased spending by locating its analysis under the heading "Waste of Resources." AOB at 28. That is confused. "[W]hether resources are being wasted" is one factor a court must consider in a receivership determination, *Hinds Cnty.*, 128 F.4th at 637—the heading merely signaled the factor being considered. Within that subsection, the court explained that, even with the increased spending, ADCRR had "proven completely incapable of

---

[10] ADCRR complains that the experts' plan was not "finalized" until March 2025. AOB at 13. But this delay was ADCRR's own making—development of the plan was delayed because it took ADCRR nearly a year to first meet the Injunction's minimal staffing requirements, and ADCRR then vigorously fought the piloting of the plan. *See* Statement of the Case § III.D, *supra*. Moreover, in November 2024, the experts informed the parties that the final plan was unlikely to differ significantly from the plan issued in April 2024, and that ADCRR should "immediately" begin the work of implementing the plan. 2-SER-393.

[11] On appeal, ADCRR claims to have achieved compliance with the June 2025 Staffing Plan in one way: "midlevel providers" are staffed at levels "already exceeding the approved Staffing Plan's requirement." AOB at 11, 26. This is extraordinarily misleading—the plan called for a *decrease* in midlevel providers because ADCRR for years has inappropriately relied on midlevel providers to manage care that should be handled by physicians. 1-SER-203.

reaching constitutional compliance" and remained in a costly contract with NaphCare to provide healthcare while "mak[ing] little effort to enforce NaphCare's obligations." 1-ER-92. *That* is what the court found was a waste of resources, not, as ADCRR insists, the mere fact that it increased its healthcare spending. That was not an abuse of discretion. *See Plata*, 2005 WL 2932253, at *31 (appointing receiver even though defendants spent over $1 billion annually on healthcare, noting that existing system "is a massive waste of money and, more importantly, life"); *Wayne Cnty. Jail Inmates*, 444 N.W.2d at 561 (finding no error in court's determination "that more expenditures by the sheriff would not produce adequate compliance with the final judgment").

Third, ADCRR says that the court "[d]iscounted" its Hepatitis C and opioid-use-disorder programs and special-needs-unit buildout, insisting that the court credited those successes "not at all." AOB at 28. Not so. The court recognized those areas as "improvements," 1-ER-81–82; *see also* 1-ER-38, 1-ER-90, and found ADCRR was compliant with several of the governing provisions of the Injunction, *see* 1-ER-107, 112, 113. However, regarding ADCRR's Hepatitis C and opioid-use-disorder programs, the court also cited "evidence that Defendants overrepresent their successes in these areas" and found it "extremely concerning that these are among the only improvements the Department continues to emphasize after pointing to these improvements years ago." 1-ER-81–82.

Fourth, ADCRR claims that despite failing to hire the staff required by the June 2025 Staffing Plan, it successfully implemented the Plan's model of care (the Patient Centered Care Model or "PCCM") "at 13 units . . . within five months of the Staffing Plan's approval, and at 31 of 43 units (72%) as of July 2026." AOB at 27. But the court considered ADCRR's claims to have implemented the PCCM at 9 units and found: "[t]his is flat wrong." 1-ER-90. Even in units where ADCRR contends it made necessary changes, "implementation is in its infancy" and lacks many "critical components." *Id.*; *see also* 2-ER-209.

*Even if* the court had not explicitly considered this evidence—and it did—a district court is "not required to base its findings on each and every fact presented." *Simenoff v. Hiner*, 249 F.3d 883, 891 (9th Cir. 2001); *see also Hashimoto v. Dalton*, 118 F.3d 671, 681 (9th Cir. 1997) ("[A] judge is not required, in making findings, to mention every item of evidence and either adopt it or reject it."). And a district court enjoys a presumption that it considered all the evidence before it. *Hashimoto*, 118 F.3d at 681.

Finally, because the court *did* invite ADCRR, repeatedly, to present their evidence of "progress," ADCRR's attempt to create a conflict with *Parker v. Hooper* fails. *See* AOB at 29 (citing 171 F.4th 736 (5th Cir. 2026) (en banc)). There, prison officials sought to supplement the record with evidence of significant new improvements. The Fifth Circuit found the court's refusal to admit this evidence "a

few months after the remedial trial—but more than a year before it issued its Remedial Opinion and Order" was error. *Parker*, 171 F.4th at 751. ADCRR makes no such claim here, nor could they. ADCRR were not deprived of any opportunity to submit evidence—indeed, *the parties agreed that no evidentiary hearing was necessary to resolve Plaintiffs' motion for a receiver*. 1-SER-215. The court nevertheless gave ADCRR ample opportunities to submit evidence. *See* Statement of the Case §§ II–IV, *supra*. The court did not abuse its discretion.

### D. ADCRR's Remaining Challenges to the District Court's Exercise of Its Discretion Fall Flat.

Lastly, according to ADCRR, a "receivership cannot stand unless the record establishes, by clear and convincing evidence, that this remedy is 'the only viable option to effectuate compliance with the laws and orders of the court.'" AOB at 38 (quoting *Dist. of Columbia v. Jerry M.*,738 A.2d 1206, 1213 (D.C. 1999)). It insists that the court's findings on several receivership factors were unsupported by such evidence. *Id*. at 38–48.

This Court has "not articulated an evidentiary standard" for the factor test a court uses to determine whether it should exercise its discretion to appoint a receiver. *See Rio Verde Plantas, LLC v. O&S Holdings, LLC*, No. 3:25-cv-00098-JR, 2025 WL 1368639, at *3 (D. Or. Mar. 21, 2025), *report and recommendation adopted*, 2025 WL 1141184 (D. Or. Apr. 17, 2025). Each factor presents, at minimum, a mixed question of law and fact that "weighs heavily on the 'fact' side," and thus this

court's review must be "deferential." *See Brown v. Plata*, 563 U.S. at 517 (discussing standard for reviewing determination that crowding is the primary cause of constitutional violation) (citation omitted); *id.* at 529 (applying clear error standard to review lower court's finding "that, absent a population reduction, continued efforts by the Receiver and Special Master would not achieve a remedy"); *see also Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025) ("We review a district court's factual findings in connection with a contempt order for clear error."). There was no such error here.

Even assuming a clear and convincing standard applies, the court's order and the underlying record plainly supply the necessary evidence. The court's 83-page order was based on a voluminous evidentiary record and the vast procedural history of this long-running case. And it is clear from the court's order that it held itself to a heightened standard. *See Detrich v. Schriro*, No. 03-CV-229, 2006 WL 3735965, at *1 (D. Ariz. Nov. 30, 2006) ("Trial judges are presumed to know the law and to apply it in making their decisions." (cleaned up)); *see also* 1-ER-96 ("The Court is cognizant that the appointment of a receiver is an extraordinary remedy that should be reserved for the most extreme circumstances. From the evidence compiled over the past decade, the Court is convinced the situation at ADCRR is such an extremity."); 1-ER-42, 45, 49, 83 (finding the evidence in the record "substantial," "overwhelming," "voluminous," and "ample" in analyzing the receiver factors).

### 1. Ongoing Threat of Harm.

In a 200-page order in 2022, the court concluded that "ADCRR prisoners who develop life-threatening medical and mental health conditions are at a significant risk of serious harm. The ones that do develop such conditions may die prematurely, suffer prolonged pain or symptoms, or survive with lifelong disabilities." 6-ER-1284. ADCRR has never claimed to have implemented, or to have even come close to implementing, the Injunction designed to remedy those harms. Nor has it ever provided evidence—expert or otherwise—that the clear, substantial risk of serious harm that plagued the prison system in 2022 has somehow been abated, despite the failure to implement the Injunction.

Nevertheless, ADCRR now claims the record of harm before the court was inadequate. But the court spent over a third of its order detailing and citing to the "overwhelming evidence" showing ADCRR still fails to "deliver[] clinically required healthcare" after the Injunction—including evidence of patients dying after experiencing extreme delays in accessing specialty care, being denied necessary higher levels of care, and receiving grossly incompetent treatment. 1-ER-45, 48, 50–56; *see also* 1-ER-58–69, 70 (recounting numerous examples of seriously deficient care and finding they reflected that "prisoners still remain exposed to an intolerable grave and immediate threat of continuing harm and suffering").

Among the serious cases cited by the experts and the court were:

- **Patient 20**, who died in March 2025 at the age of 78. He had a history of seizure disorder and was prescribed an antiseizure medication in 2023 that improved his seizures. In February 2025, healthcare staff discontinued that medication without reviewing his medical history. Two weeks later, he suffered a prolonged seizure requiring intubation and hospitalization. He died four days later. 1-ER-50; 4-ER-582.
- **Patient 49**, who had an untreated infection that invaded the bones of his spine and required urgent management. A nurse repeatedly dismissed his symptoms and told him his neck pain was because he had slept wrong. By the time he was finally sent to the hospital, almost a month later, the infection had spread to his blood, heart, brain, and spine. He required antibiotics administered directly into the fluid around his brain. 1-ER-62–65; 4-ER-632.
- **Patient 58**, who was diagnosed with cancer and had been waiting for more than eight months to see an oncologist at the time of the experts' report. He reported suffering from increasing pain, fear, and crying himself to sleep as he waited for critical care. 1-ER-67; 4-ER-646.
- **Multiple patients** who required essential mental health treatment and were seen by a revolving door of different therapists, none of whom knew the patients, their history, or the interventions previously tried. 1-ER-93; 4-ER-758.

- **Patient 23**, who died in March 2025 at 35 years old of pneumonia. The experts opined his death "would likely have been prevented" had he been seen by "a competent practitioner" when he requested medical care from ADCRR. 1-ER-53–54; 4-ER-587–89.
- **Patient 59**, who from September 2024 until June 2025, waited more than nine months to have cancerous tumors removed, "creating significant – but avoidable – risk" that his tumors grew to a size "associated with lower rates of cure and . . . decreased overall survival." 1-ER-67–68; 4-ER-649.
- **Patient 29**, who experienced "severe abdominal pain" for seven days "that ADCRR failed to control," and was ultimately found to have a perforation of the colon that "had ruptured hours to days before he was sent to the ER." *See* 4-ER-591–92. ADCRR acknowledged error in its mortality review process but did nothing to address it, and "three subsequent deaths contained the same recommendation." 4-ER-592.
- **Patient 78**, who has Type 1 diabetes and experienced four emergency episodes of hypoglycemia in a single year, yet ADCRR repeatedly refused to provide him necessary medication (oral glucose) to keep in his possession, choosing instead to only provide glucose at the prison clinic once he was "delirious or unconscious." 1-ER-69; 4-ER-689.

ADCRR did not meaningfully dispute the voluminous evidence of harm below, nor do they attempt to do so on appeal. Instead, they take aim, again, at the court's weighing of the evidence, claiming the court abused its discretion by focusing on isolated cases with adverse outcomes, and that the experts' methodology for measuring compliance was unsound. AOB at 39.

Casting the numerous accounts of serious harm recounted by the court as "isolated incidents unmoored from systemic proof" is a gross misrepresentation of the record. AOB at 49. The experts' report was based on a review of more than 200 patient charts. 5-ER-882. And the court did not confine its analysis to case examples. It found ADCRR's violations of the Injunction "are brought to life—or death—by the individuals who experienced profound delays in receiving treatment or who failed to receive treatment at all," 1-ER-45, 46–49, but it also reviewed, among other things, the experts' comprehensive assessment of every provision of the Injunction, as well as ADCRR's own self-reported noncompliance data, 1-ER-44, 46–48.

The court's conclusions were undergirded by its extensive findings of fact in 2022, and the "factually well-supported, reliable opinions" of the neutral, court-appointed monitors. 1-ER-40; *see Plata*, 2005 WL 2932253, at *3 ("The extensive and disturbing findings of the Expert's reports are essentially uncontested, and the

Court finds that they accurately describe an extreme crisis in CDCR's medical delivery system.").

### 2. Bad Faith.

In arguing the court's bad faith analysis lacked adequate evidentiary support, ADCRR mischaracterizes the court's findings. *Compare* AOB at 44–45 *with* 1-ER-86–91. ADCRR's chief argument is that the court inappropriately based its finding on ADCRR's objections to the experts' conclusions. AOB at 44–45. Not so. The court noted that many of ADCRR's "arguments in opposition to the Monitors' comments, opinions, and direction" boiled down to belated objections to the Injunction—which they helped draft and agreed to—and *this behavior* was evidence of bad faith. 1-ER-87–88 (finding ADCRR's decision to "quarrel so fixedly with the Injunction" after helping to draft it, "casts serious doubt on Defendants' averments of good faith" and "reflects a profound misunderstanding of the harm their conduct has caused over the past decade"). The court's analysis was further supported by:

- ADCRR's failure to implement key provisions of the Injunction, *see* 1-ER-89–90, even those which the court experts noted could have been implemented "within a few days of issuance of the Injunction," 4-ER-602;
- ADCRR's abandonment of the staffing pilot, after agreeing it was necessary, and failure to take reasonable steps to prepare for statewide implementation of the staffing plan, despite clear direction from the court and its experts, 1-

ER-88–89 (noting ADCRR "treated the Pilot as an incidental, insignificant, optional activity and the subsequent implementation of the plan as an unlikely potentiality");[12] and

- ADCRR's "regular overstatement of [its] 'progress'" and "reporting of inaccurate data," 1-ER-89–90.

Ultimately, the court concluded that, "[r]egardless of assurances of good faith, Defendants have repeatedly failed to implement necessary changes as directed by the Court and Monitors, both throughout the lengthy history of this case and since the issuance of the Injunction." 1-ER-91. That conclusion was clearly and roundly supported by the record.

---

[12] ADCRR minimizes its failure to carry out the pilot in good faith by describing the myriad problems identified by the court and its experts as "shortcomings," and asserting "the pilot did what pilots are designed to." AOB at 13, 45. To be clear, ADCRR and its vendor unilaterally abandoned the pilot at one of the two sites it had chosen for implementation only eight days in. 1-ER-88; 1-ER-76–77. And as the court summarized, "[t]hroughout the Pilot, Defendants argued with the requirements, failed to comply with the necessary staffing provisions, provided minimal and inaccurate data, and implemented fewer than half of the enumerated steps and activities necessary for the Pilot." 1-ER-88. The court did not err in concluding this behavior evidenced bad faith.

### 3. Lack of Leadership.

Finally, the court's finding that ADCRR displayed "a stark lack of leadership able to effectively implement the requirements of the Injunction," was also well-supported. 1-ER-80; *compare* AOB at 46 *with* 1-ER-80–86.

This lack of leadership, the court found, was evinced in part by ADCRR's recent "grim performance" in implementing the staffing pilot, 1-ER-80; ADCRR's tendency to "deflect responsibility to their [healthcare] vendor," and "actively avoid leadership and responsibility" regarding the provision of healthcare to patients, 1-ER-83; as well as "their apparent need for constant micromanagement … rather than proactively taking steps to enforce their [healthcare] contract with [their vendor]," 1-ER-84. The court's finding was also supported by ADCRR's failure to fill a critical leadership position—since August 2024, the statewide Medical Director position has been vacant outside of a brief, four-month period. 1-ER-81; 1-SER-10–11; *see* Argument § I.A, *supra*. ADCRR's minimization of that vacancy as a "hiring challenge" does nothing to negate the fact that the vacancy demonstrates a lack of leadership capacity. AOB at 47. At bottom, ADCRR's only response is to parrot once again that new leadership has made substantial progress and will continue to do so. *Id*. at 19, 25. But the district court reasonably found that neither that "progress," Argument §§ I.B. & I.C., *supra*, nor continued promises about what leadership will do in the future were sufficient to tilt the balance of factors in

ADCRR's favor. 1-ER-80, 85–86; *see Dixon v. Barry*, 967 F. Supp. 535, 553 (D.D.C. 1997) ("The Court is respectful of the District's attempt to effectuate real change in its mental health system. Unfortunately, this is a song that the District has sung many times before.").

Finally, ADCRR claims the receiver appointed to oversee medical care in the California prisons demonstrates that "displacing state leadership is no shortcut to success." AOB at 47. But a finding that progress under the *Plata* Receivership has been slow would do nothing to undermine ADCRR's long track record of intransigence and failed leadership. In any event, ADCRR's criticisms of the *Plata* Receiver are misplaced. The *Plata* Receiver has in fact been so successful that the State of California requested that he also be appointed to oversee mental health care (in addition to medical care) in the state prisons.[13] 1-SER-235. ADCRR's emphasis on the length of time the *Plata* Receivership has been in place also omits key context: as the Supreme Court recognized, the *Plata* Receiver was, for years, limited in what he could achieve due to factors beyond his control—primarily, overcrowding in the state prison system. *See Brown v. Plata*, 563 U.S. at 514, 529. Once crowding was

---

[13] ADCRR is wrong to suggest this means the receivership in *Plata* "was expanding, not concluding, when the court invoked it." AOB at 48. The State requested the *Plata* Receiver be appointed in a different case, to oversee the State's mental health care delivery system, due to his success in transforming CDCR's healthcare system in *Plata*.

remediated, the system saw "improved [healthcare] under the receiver" and the subsequent return of oversight of the medical program at 31 of 35 prisons back to the State. 1-ER-92, 95 n.62.

Amici throw out different figures related to costs in the California prison system, Amici Br. at 23–24, but without necessary context that amounts to little more than fearmongering.[14] In California, "no party has ever suggested that [the receiver]'s budget is excessive or that the funds are not being spent wisely." 1-SER-281. Moreover, there are nearly 100,000 people incarcerated in California's 31 prisons—significantly more than the approximately 25,000 incarcerated in Arizona's nine state-run prisons.[15] Amici's arguments also conflate the budget for

---

[14] Amici also point to "struggles" with the receivership in *Newman v. Alabama* and the court-appointed monitor in *Melendres v. Sheridan*, apparently in attempt to show receivership *here* is a lost cause. Amici Br. at 24. Amici's only support for their suggestion that the *Newman* receivership was expensive and unsuccessful, *id*., is an article that attributes any failings to "the conflict of interest inherent in appointing an executive officer as a receiver," Laura Weingart, *Judicial Remedies of Last Resort: Receiverships in the Prison Litigation Context*, 9 CARDOZO PUB. L. POL'Y & ETHICS J. 193, 211 (2010). Those same concerns are not present here, where a seasoned corrections official—not the Governor of Arizona—has been appointed as the receiver.

Amici's argument that the "court-appointed *monitor*" in *Melendres* has raised significant monetary concerns for Arizona also falls flat. Amici Br. at 24 (emphasis added). Of course court-appointed monitors, when faced with government intransigence, may not be able to ensure constitutional minimums even with significant expenditures—that is precisely why Plaintiffs moved for the more potent remedy of receivership after years of monitoring proved unable to coerce ADCRR to comply with the Constitution. *See Brown v. Plata*, 563 U.S. at 511.

[15] At the height of overcrowding, California's prisons held more than 150,000

the California Receiver and his staff—which is de minimis compared to the overall budget for the California prison system—with the amount of money needed to provide minimally adequate health care to thousands of people in California prisons—which, as here, the State would incur in any event. *See id*. at 24. And finally, "the issue of costs cannot be used as an argument against implementing necessary constitutional reforms." *Melendres v. Sheridan*, No. 07-CV-2513, 2026 WL 411745, at *4 (D. Ariz. Feb. 13, 2026) (citing *Watson v. Cty. of Memphis*, 373 U.S. 526, 537 (1963)).

+ + +

At bottom, ADCRR simply disagrees with the district court's weighing of the evidence. But the court's fact-intensive, record-specific determination is owed "substantial deference," especially because it has "developed an understanding of the difficulties involved in constructing and managing a [correctional system] that an appellate court, even with the best possible briefing, could never hope to match." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393–94 (1992) (O'Connor, J., concurring). ADCRR's qualms do not amount to reversible error.

### E. Receivership is an Available Remedy.

Buried on page 48 of their brief, ADCRR says "it is questionable whether a

---

people. *See Brown v. Plata*, 563 U.S. at 501.

federal court may ever impose a receivership … over [a State's] prisons." AOB at 48. They say this is because the PLRA does not explicitly authorize such relief and allude to the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). *Id*. at 48–49. ADCRR forfeited those arguments by failing to raise them below, and they offer no reason for this Court to depart from its "general rule against entertaining arguments on appeal that were not presented or developed before the district court." *In re Mercury Interactive Corp. Secs. Litig*., 618 F.3d 988, 992 (9th Cir. 2010) (cleaned up).

Forfeiture may be excused where "exceptional circumstances" caused the forfeiture, there is a "change in the law," or "the issue presented was purely one of law and the opposing party would suffer no prejudice" if the forfeited claim were reviewed. *Taniguchi v. Schultz*, 303 F.3d 950, 959 (9th Cir. 2002). ADCRR offers no "exceptional circumstances" that excuse its forfeiture, and no intervening legal development calls for leniency. The PLRA was enacted decades ago, *see* 42 U.S.C. § 1997e *et seq*., and the Supreme Court decided *CASA* on June 27, 2025, nearly eight months before the court entered its receivership order. Yet ADCRR never asked the court to consider the novel claim they press here: ADCRR did not raise this argument during the September 2025 hearing on Plaintiffs' motion for a receiver or in the briefing submitted in connection with that hearing. Nor did ADCRR file a Notice of Supplemental Authority with the court. *See Vega v. All My Sons Bus. Dev. LLC*, 583

F. Supp. 3d 1244, 1256 (D. Ariz. 2022).

ADCRR now half-heartedly asserts that whether a historical analogue to receiverships over state prisons exists is "question[able]" and "uncertain." AOB at 50. Assuming the premise of ADCRR's argument is correct, a proper rebuttal requires answering whether a receivership over state prisons has an adequate "founding-era antecedent." *Id.* (quoting *CASA*, 606 U.S. at 847). That is not a pure question of law. It requires factual development, including, in ADCRR's view, historical research dating back to the nation's founding (or even earlier). Had ADCRR raised this argument below, the parties could have developed a factual record to answer the question at some point in the eight months between *CASA* and the court's Appointment Order. That never happened. Far from a "purely technical matter," depriving Plaintiffs of the opportunity to develop the record necessary to defeat ADCRR's belated argument is plainly prejudicial, especially in this expedited appeal.[16] *See, e.g.*, *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 n.4 (9th Cir. 2002) (finding prejudice where failure to raise argument meant opposing party could not develop facts below that supported alternative arguments).

Lack of preservation aside, the argument that ADCRR conjures from *Trump*

---

[16] Plaintiffs, out of an abundance of caution, respond substantively to ADCRR's forfeited argument, *infra*, but maintain it is prejudicial to demand Plaintiffs prepare a comprehensive record of the history of judicial oversight over prisons since the nation's founding for the first time in this expedited appeal.

*v. CASA*—that the court engaged in a newfangled, and thus prohibited, exercise of judicial authority, AOB at 48–49—misses the mark. Even assuming that receivership orders require a rough historical match to pass muster, and it's not clear that they do, ADCRR gets the history wrong.

Since the founding era, courts have routinely managed carceral facilities. In Pennsylvania, for example, judges appointed "inspectors," who were responsible for hiring and firing wardens, directing the hiring of other corrections personnel, setting prison staff salaries, and submitting recommended rules and regulations to the judiciary and other officials for approval. Act of April 18, 1795, § 4, *reprinted in* 15 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 at 355–56 (Hampton L. Carsons et al. eds., 1903); Act of Sept. 23, 1791, § 18, *reprinted in* AN ABRIDGMENT OF THE LAWS OF PENNSYLVANIA FROM THE YEAR 1700 TO APRIL at 2, 1811, 197, 197 (John Purdon, Jr. ed., Philadelphia, Farrand, Hopkins, Zantzinger & Co. 1811). In Delaware, court-appointed prison "commissioners" were authorized to "make ordinances and regulations," fire wardens, and "draw orders upon the County Treasurer" to cover the cost of providing necessities to prisoners. Act of Feb. 5, 1827, § 6, *reprinted in* LAWS OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD, 1829, INCLUSIVE, 448–49 (Willard Hall ed., Dover, R. Porter & Son rev. ed. 1829). In Massachusetts, courts wrote "rules . . . for the government" of prisons and appointed "overseers" who were responsible for ensuring compliance with those

rules. Act of Feb. 27, 1798, § 1, *reprinted in* 2 THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, 812, 812–13 (Boston, J.T. Buckingham 1807). In Maryland, courts "appoint[ed] and employ[ed]" corrections staff, including doctors, who were responsible for the welfare of incarcerated people. Act of Dec. 25, 1789, ch. 44, § 10, *reprinted in* LAWS OF MARYLAND, 1785-1791, 426, 427 (Annapolis, Frederick Green 1790). And in Kentucky, judges could not only draft and enforce corrections rules, but also discipline corrections personnel who were neglectful or disobedient. KY. REV. STAT., ch. 91, art. II, § 11 (1851), *reprinted in* 2 THE REVISED STATUTES OF KENTUCKY, APPROVED AND ADOPTED BY THE GENERAL ASSEMBLY, 1851 AND 1852, 346, 349 (Richard H. Stanton ed., Cincinnati, Robert Clarke & Co. 1867).[17]

America did not invent these oversight practices—it imported them from England. There, the Court of the King's Bench advised the Crown on prison leadership, ordered prison staff to improve conditions, and fined or fired prison wardens for misconduct. *See Lady Broughton's Case* (1672) 83 Eng. Rep. 112, 112–

---

[17] Any argument that this history is inapplicable to *federal* courts overseeing *state* prison systems is unavailing. 42 U.S.C. § 1983 authorizes federal "suits in equity" against state officials who violate federal rights—it was plainly intended to make equitable remedies available in federal courts against state officers. *See Felder v. Casey*, 487 U.S. 131, 139 (1988) (explaining that in enacting Section 1983, Congress created "a uniquely federal remedy against incursions upon rights secured by the Constitution and laws of the Nation").

13; Raym. Sir T. 216, 216 (KB); *New Marshal of the King's Bench Prison* (1768) 98 Eng. Rep. 138, 138; 4 Burr. 2183, 2183–84 (KB). Indeed, outside the carceral context, "[j]udicial reliance on receivers dates back at least to sixteenth century England." *Digit. Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 778 (6th Cir. 2023); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").[18]

Modern practice is consistent with these antecedents. Both this Court and the Supreme Court explained relatively recently that judges are authorized to order prison receiverships. According to this Court, "[t]here can be little question . . . that receiverships are recognized equitable tools available to the courts to remedy

---

[18] ADCRR also misapprehends the history of receiverships outside of the carceral context—the assertion that federal courts only appointed receivers over private parties prior to the 1960s is incorrect. First, the court in *Meriwether v. Garrett*, 102 U.S. 472 (1880), did not hold that federal courts cannot impose receiverships over State entities. The court merely took issue with the specific powers granted to the receiver in the context of that case. *See id.* at 508–10 (denying receiver power to levy new taxes and to seize all the city's assets—including all of its tax revenue and funds, as well as public and private property). Federal courts, before and after *Meriwether*, have placed cities, counties, and other localities into receiverships. *See, e.g.*, *Supervisors v. Rogers*, 74 U.S. 175, 180–81 (1868) (affirming appointment of "commissioner" empowered to levy and collect county's taxes); *Connett v. City of Jerseyville*, 110 F.2d 1015, 1020 (7th Cir. 1940) (noting that a federal receiver had been lawfully operating municipal water system for years).

otherwise uncorrectable violations of the Constitution or laws." *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093–94 (9th Cir. 2010). The Supreme Court agrees: "Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters *or receivers* and the possibility of consent decrees." *Brown v. Plata*, 563 U.S. at 511 (emphasis added).[19] *Plata* is no outlier. When warranted, contemporary federal courts have repeatedly appointed prison and jail receivers.[20]

---

[19] ADCRR attempts to diminish the force of this precedent on the purported basis that, unlike the ADCRR, the *Plata* defendants *consented* to the appointment of a receiver. AOB at 49. That is wrong. In the district court, the *Plata* defendants explicitly opposed the appointment of a receiver. *E.g.*, Joint Status Conf. Stmt. at 25–26, *Plata v. Schwarzenegger*, No. 4:01-cv-01351 (N.D. Cal. Apr. 7, 2005), ECF No. 289 ("Defendants disagree that a Receiver should be appointed at this time."). The *Plata* defendants also vigorously fought for the receiver's termination on the very same grounds that ADCRR asserts here—claiming that as a matter of law, federal courts lack the equitable power to appoint prison receivers. *Plata*, 603 F.3d at 1092–93.

[20] *E.g.*, *Newman*, 466 F. Supp. at 636 (placing state prison system under receiver's control to ensure compliance with prior court orders and constitutional standards); *Shaw v. Allen*, 771 F. Supp. 760, 764 (S.D. W. Va. 1990) (appointing receiver to operate jail in order to ensure compliance with district court orders and constitutional standards and discussing similar appointment of receiver over the Cabell County Jail in *Brown v. Bailey*, No. 78-3046 (S.D. W. Va. June 5, 1981), *aff'd by* 734 F.2d 10 (4th Cir. 1984)); Findings & Order Appointing Receiver, *Inmates of D.C. Jail v. Jackson*, 1:75-cv-01668, (D.D.C. July 11, 1995), ECF No. 87 (placing medical and mental health services under receiver's control); *Hinds Cnty.*, 2022 WL 3022385 at *11 (granting motion for a receiver to operate jail to remedy ongoing unconstitutional conditions); *Coleman v. Newsom*, No. 2:90-cv-0520, 2025 WL 2475040, at *1 (E.D. Cal. Aug. 27, 2025) (placing prison mental health care under receivership); *Nunez v. New York City Dep't of Corr.*, 782 F. Supp. 3d 146, 168–75 (S.D.N.Y. 2025) (appointing "Remediation Manager" with powers

Simply put, far from a practice that "was conspicuously nonexistent for most of our Nation's history," *CASA*, 606 U.S. at 845, the order to appoint a receiver in this case is but one in a long line of analogous exercises of judicial authority. ADCRR points to no disagreement among the federal courts over the authority of courts to issue this remedy.

ADCRR's nested statutory argument—that the PLRA prohibits prison receivers because the text explicitly authorizes the appointment of special masters, but not receivers, AOB at 48–49—also fails. This Court roundly rejected this argument in 2010 after analyzing the text and legislative history of the PLRA. *Plata*, 603 F.3d at 1093–97; *see also Benjamin v. Fraser*, 343 F.3d 35, 46 (2d Cir. 2003) (reaching a similar conclusion), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). Nothing in the intervening period—not legislation, not contemporary precedent, and certainly not recent excavations of Founding-era history[21]—calls for a different result.

---

and duties akin to a receiver to remedy constitutional violations in a jail), *reconsideration denied by* No. 11-CV-5845-LTS-RWL, 2025 WL 2939046 (S.D.N.Y. Oct. 16, 2025), *and objections overruled by* No. 11-CV-5845-LTS-RWL, 2025 WL 3678122 (S.D.N.Y. Dec. 18, 2025).

[21] *See*, *e.g.*, Wynne Muscatine Graham, *The Forgotten History of Prison Law: Judicial Oversight of Detention Facilities in the Nation's Early Years*, 138 HARV. L. REV. 1715, 1742–57 (2025) (outlining early courts' involvement in prison and jail administration); Con Reynolds, *The Judicial Role in Federal Imprisonment*, 175 U. PA. L. REV. (forthcoming 2027), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6734518 (same).

## II. The Appointment Order Does Not Exceed the Limits of the PLRA or Federal Courts' Equitable Authority Because It Intrudes on State Authority Only Where Necessary.

ADCRR and Amici conclude by sensationalizing the court's order delineating the receiver's powers. AOB at 51–57; Amici Br. at 12–19. Of course, litigation involving correctional facilities can have federalism implications. *See* Amici Br. at 12–18. But, just like in any other area of law, general appeals to state sovereignty never justify evading specific constitutional requirements. Rather, as this Court has recognized, "state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861–62 (9th Cir. 1992) (cleaned up); *see also Brown v. Plata*, 563 U.S. at 510 ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."); *Bounds v. Smith*, 430 U.S. 817, 832 (1977) ("While we have recognized that judicial restraint is often appropriate in prisoners' rights cases, we have also repeatedly held that this policy cannot encompass any failure to take cognizance of valid constitutional claims.") (internal quotations omitted); *Dixon*, 967 F. Supp. at 551 ("When dire facts justify the use of the receivership power, considerations of federalism and comity do not warrant withholding a necessary remedy."). Any purported federalism concerns do not give ADCRR license to maintain unconstitutional prison conditions.

Moreover, the court was careful to craft a remedy that limits intrusions on the

State's authority. *See* 1-ER-2–16. Upholding the court's orders will merely permit the mutually-agreed-upon receiver, who was nominated by Arizona prison officials and who is mandated to work collaboratively with them, to begin work in facilitating the implementation of the very substantive measures they previously committed to. *See* 1-ER-12. ADCRR and Amici's concerns are exaggerated and premature.

### A. The District Court Did Not Authorize the Receiver to Bypass State Law Without Meeting the PLRA.

Despite ADCRR and Amici's suggestion to the contrary, AOB at 52–55; Amici Br. at 17–18, the receiver is required to "endeavor to perform all responsibilities and duties in accordance with Arizona state laws, regulations, and contracts," 1-ER-12. She has no unilateral authority to set state law aside. If a waiver is necessary, she must request one from the court, which "shall solicit input from Defendants and Plaintiffs before rendering a decision." 1-ER-12–13. That structure follows the PLRA, which expressly contemplates relief that displaces state law where "[f]ederal law requires such relief to be ordered in violation of State or local law," "the relief is necessary to correct the violation of a Federal right," and "no other relief will correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(B); *see also Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1402–03 (9th Cir. 1997) (holding the Supremacy Clause preempted an Arizona law prohibiting the payment of a special master).

The structure is consistent with the powers other courts have determined

receivers over other State prison systems require. In *Dixon v. Barry*, for instance, the court explained that the "receiver may petition the Court to waive any requirements imposed" by "the laws and regulations of the District of Columbia" in the same order directing the appointment of a receiver. 967 F. Supp. at 556; *see also Plata v. Schwarzenegger*, No. C01-1351, 2006 WL 8563430, at *2 (N.D. Cal. Feb. 14, 2006) (directing that "the Receiver shall request the Court to waive the state or contractual requirement" in such circumstances); *Coleman v. Newsom*, No. 2:90-cv-0520, 2025 WL 3693004, at *3 (E.D. Cal. Dec. 19, 2025) (same); *Nunez*, 782 F. Supp. 3d at 171–72 (granting the Remediation Manager authority to "[p]etition[] the Court to waive any legal or contractual requirements that impede the Nunez Remediation Manager from carrying out their duties").

ADCRR's objection to this provision presupposes—without any basis—that if this process is invoked, the court will apply the wrong standard. AOB at 59. This speculative, unfounded concern does not warrant reversal of the court's order.

### B. The Appointment Order Does Not Permit the Receiver or District Court to "Commandeer Arizona's Constitutional Appropriations" Process.

Contrary to the conjecture of ADCRR and Amici, the court likewise did not give the receiver "unreviewable budget authority" or permit the receiver to "bypass the appropriations process." AOB at 55; Amici Br. 19–23. Rather, the court's order was targeted and careful: the receiver "shall be responsible for formulating and

establishing the annual ADCRR health care budget," but has only the "authority vested by law in the Director of ADCRR relating to the financing of the prison health care system." 1-ER-8. The receiver thus must "engage in essential efforts to secure adequate funding in consultation with Plaintiffs and Defendants, the Governor, *and the Legislature*." 1-ER-5 (emphasis added). If that process fails and the receiver determines budgeted funds "are inadequate to accomplish the Receiver's authorities and duties," she is required to "first consult the Director" and then to "notify[] the Legislature and the Governor's Office of such deficiency." 1-ER-15. If additional funding is still not provided, the parties or receiver "*may* prompt the Court to order the waiver of Arizona State laws, regulations, and contracts that interfere with the requirements and desired outcome of the Receivership." *Id.* (emphasis added).

This too is consistent with the financial authority other courts have determined receivers over other state prison systems require. *See*, *e.g.*, *Dixon*, 967 F. Supp. at 556 (giving the receiver the responsibility "[t]o oversee, supervise, and direct all financial, contractual, legal, administrative, and personnel functions of the CMHS"); *Plata*, 2006 WL 8563430, at *2–3 (ordering that "[t]he Receiver shall determine the annual CDCR medical health care budgets consistent with his duties").

*Hinds County* does not move the needle. Amici Br. at 19–21. Although the Fifth Circuit remanded a portion of the district court's receivership order granting the receiver the power to set the prison system's budget, the amended order

delineating the receiver's budgetary authority matches the authority vested here. *See* Order on Receiver's Duties at 4–6, *United States v. Hinds Cnty*., No. 3:16-cv-489 (S.D. Miss. June 27, 2025), ECF No. 282-2 (requiring the receiver to "consult with the Sherriff in preparing the annual RDC budget, which shall include staff salaries and benefits … and any other remedies needed to address the constitutional deficiencies documented in this case" subject to approval by the Board of Supervisors, but allowing the receiver to "propose budget modifications to the Board of Supervisors" and bring unapproved modifications before the court).

ADCRR and Amici's budgetary and appropriations concerns are speculative and premature.

## CONCLUSION

For the foregoing reasons, this Court should uphold the district court's Receivership Order and Appointment Order.

Date: October 15, 2026

Respectfully submitted,
*/s/*
Sophie Hart
Rosalind Dillon
Donald Specter
**PRISON LAW OFFICE**
*Attorney for Prisoner Class Plaintiffs-Appellees*

*/s/*
Maya S. Abela
**DISABILITY RIGHTS ARIZONA**

*Attorney for Plaintiff-Appellee Disability Rights Arizona*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee Disability Rights Arizona certifies that it is a registered 501(c)(3) nonprofit organization, has no parent corporation, and no publicly held corporation holds ten percent (10%) or more of its stock.

Date: October 15, 2026

**DISABILITY RIGHTS ARIZONA**
*/s/*
Maya S. Abela
4539 E. Fort Lowell Rd.
Tucson, AZ 85712
(520) 327-9547
*Attorney for Plaintiff-Appellee Disability Rights Arizona*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of Ninth Circuit Rule 32-1(a), which requires answering briefs to not exceed 14,000 words, and Rule 32-2(b), which permits an extra 1,400 words automatically where a single brief is responding to "multiple briefs" (here, ADCRR's Opening Brief and the Amici Brief filed by Arizona House of Representatives Speaker Steve Montenegro and Arizona State Senate President Warren Petersen). This brief contains 14,974 words, excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: October 15, 2026

*/s/*
Sophie Hart
**PRISON LAW OFFICE**
*Attorney for Prisoner Class Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing System.

Date: October 15, 2026

*/s/*
Sophie Hart
**PRISON LAW OFFICE**
*Attorney for Prisoner Class Plaintiffs-Appellees*